# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1812

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| Louis B. Oberhauser, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 12, 2002

Filed: April 4, 2002

_____

Before McMILLIAN, FAGG, and RILEY, Circuit Judges.

_____

FAGG, Circuit Judge.

Richard Gravatt, Joe King, Richard King, Murray Evans, Frank Taylor, and Scott Wallis were charged in an eighty-nine count indictment with conspiracy, wire fraud, mail fraud, money laundering, and conducting a continuing financial crime enterprise. The charges arose from their operation of a Treasury bill-leasing "ponzi" scheme through a corporation called K-7. Investors in the scheme lost over $11 million. Louis B. Oberhauser, the group's lawyer, held some of the invested funds in an attorney trust account designated for K-7 investment money, and a superseding indictment added him as a defendant. All the defendants except for Gravatt and Oberhauser pleaded guilty. At a joint trial, Gravatt was convicted on 68 counts and

sentenced to 262 months in prison. The jury acquitted Oberhauser of 64 of 66 counts, but convicted him on two counts of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). The district court granted Oberhauser's motion for acquittal, and conditionally granted his alternative motion for a new trial. The Government appeals.

We must reinstate the jury's verdict "if, drawing all reasonable inferences in favor of the verdict, 'there is an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty beyond a reasonable doubt.'" United States v. Ervasti, 201 F.3d 1029, 1036 (8th Cir. 2000) (quoting United States v. Vig, 167 F.3d 443, 447 (8th Cir. 1999)). To convict Oberhauser of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), the Government was required to prove that Oberhauser, "engaged in financial transactions with the knowing use of the proceeds of illegal activities" and with the "intent to promote the carrying on" of unlawful activity. United States v. Jolviet, 224 F.3d 902, 909 (8th Cir. 2000). The criminalized act under § 1956(a)(1)(A)(i) is the reinvestment of illegal proceeds rather than the concealment of those proceeds. Id.

The Government relies on the following trial evidence as proof of Oberhauser's guilt. Oberhauser's first contact with anyone involved in K-7 was in the spring of 1995 when Gravatt and Steven Cudlipp hired Oberhauser, a real estate and corporate attorney, to facilitate the purchase of a $2.8 million property. The realtor, who worked in the same building as Oberhauser, introduced Gravatt to Oberhauser. Unbeknowst to the realtor and Oberhauser, Gravatt had served time in prison for fraud. On behalf of his clients, Oberhauser incorporated Carlingford Management Services, which was to own the property. The Carlingford Foundation deposited $250,000 in earnest money, but after numerous delays, the earnest money was forfeited when Gravatt and Cudlipp did not pay the balance due. Gravatt explained to Oberhauser that he had a falling out with Cudlipp. In January 1996, Gravatt established a high finance company (the predecessor to K-7) for the purpose of

performing trading programs organized by Gravatt. Oberhauser was retained on the company's behalf.

Gravatt's trading program was a "roll program" in which the company would supposedly trade $100 million in treasuries making a small percentage on every trade, which through a multiplication factor would yield a large income. Gravatt said the Treasury bills could not be leased until the company had $5.5 million in investment money. According to cash investment sheets provided to investors, the $5.5 million total investment would be used to lease $100,000,000 in Treasury bills, and trades on those bills would yield $2,000,000 per trade and $900,000 per trade to investors, with a weekly amount to investors of $3,600,000. Rental fees of $13,750,000 and a set up fee of $3,000,000 would be paid. For a participant investing $50,000 towards the $5.5 million, the total treasury amount would be $909,091, the yield per trade would be $18,182, the yield per trade to investor would be $8182, the weekly amount to the investor would be $28,459, and the net amount to the investor would be $1,166, 818. At trial, the Government's expert witness testified the program's claims amounted to a preposterous 2000% return. To make the program attractive to employees and investors, profits from the trading program were to go to the charity ChildHelp.

On February 8, 1996 Oberhauser sent Joe King a retainer letter acknowledging Oberhauser's firm had been retained to consult with King about matters relating to the company and the distribution of funds. Oberhauser stated he would "accept wire transfers of funds into a designated depository account on [the company's] behalf, and [would] disburse the[] funds . . . per written direction of Joe W. King or other parties properly authorized." Gravatt introduced Oberhauser to Taylor as the escrow attorney who was to receive the funds from the investors and hold them until he could "authenticate, verify and validate the treasuries," then release them for trading. Oberhauser drafted an escrow agreement, letter of authorization to act on the investor's behalf, and agreement of procedures. In April 1996, after Oberhauser helped incorporate K-7, Gravatt promised Oberhauser 1% of any deal if he helped

arrange a standby letter of credit in the amounts of $9, 18, or 27 million. Oberhauser introduced K-7 to a bank in an effort to secure financing for them. In the spring of 1996, Scott Wallis joined K-7 as a consultant and was paid a weekly salary to bring investors to K-7. Wallis was introduced to Oberhauser at K-7's offices, 12 rented apartments in an upscale Minneapolis suburb, as K-7's attorney.

K-7 raised money in two ways. First, K-7 and certain investors entered into a contract that represented K-7 had "knowledge, experience and contacts in the marketplace for bank instruments necessary to make prudent decisions in the contracting for leasing of United States Treasury 'T' Bills," with the funds being deposited in the Group Resources, Inc. bank account. Between May and December 1996, $1.43 million in investment money was deposited in the Group Resources account. Second, investors and Oberhauser's law firm entered into contracts giving Oberhauser "authorization to act upon [the investor's] behalf for the purpose of entering into a trading program with International Capital Services, Inc.," after receiving $5.5 million. The funds were deposited in an Oberhauser firm trust account set up for the exclusive purpose of holding investors' money. Oberhauser did not solicit the investors or advise the investors himself.

In August 1996, Gravatt and King discussed with Oberhauser the preparation of a termination contract for Lin Fox, a woman hired by K-7 to be Gravatt's girlfriend. For this legal work, he billed K-7 for a "general corporate matter." In the fall of 1996, Wallis overheard Gravatt and King discussing that Oberhauser was going to "make $20 million on this deal," and later asking Oberhauser what he was going to do with all those millions.

On August 28, 1996 King transferred $160,000 of investors' funds from the Group Resources account to the Oberhauser trust account. Oberhauser was familiar with Group Resources because his firm had been paid $5000 on April 17, 1996, for legal services on behalf of K-7 from an account in the name of Group Resources.

Further, Oberhauser identified the $160,000 as investors' funds on his trust account bank statement. Oberhauser was convicted of money laundering for this transaction. Meanwhile, the K-7 principals attempted to buy a $10 million office building with Oberhauser acting as their attorney. On August 30, 1996, Oberhauser prepared a letter to the real estate company submitting K-7's bid on the building but refusing to provide K-7's financial information and references unless K-7 was the successful bidder. Eventually, K-7 forfeited $350,000 in earnest money. Beginning in August 1996, Sandro Sordi, Esq., on behalf of Gordon Groves, began negotiating with K-7 for Groves' $2.5 million investment as purportedly the last part of the $5.5 million. Knowing he was holding only $ 1.3 million, Oberhauser redrafted the contracts for Sordi and removed the language requiring a total of $5.5 million. In October 1996, before Groves' $2.5 million was commingled with the $1.3 million, Oberhauser started transferring funds from the trust account: $600,000 for leasing the Treasury bills, and $411,000 to K-7. Oberhauser later traveled with Gravatt and King to Atlanta for settlement on the Treasury bill lease, and faxed copies of the documents to Sordi, who then released Groves' $2.5 million to Oberhauser's trust account. From those funds, Oberhauser transferred $2.4 million as a further broker's commission and another $100,000 to K-7.

On November 18, 1996, Oberhauser visited Wallis at the K-7 offices and obtained a worthless $1.9 million note payable to the Oberhauser trust account on behalf of Monarch Consulting, a corporation of Joe King's, and then sent Sordi a letter describing that he had obtained the full $5.5 million through $3.511 million in escrowed investor deposits and "a direct payment [by Monarch Consulting] of $1,989,000." On November 25, 1996, Oberhauser transferred $160,000 to ChildHelp. At trial, an Internal Revenue Service agent testified the transfer to ChildHelp was money laundering because it made the money appear to be proceeds of a successful deal. The jury agreed and convicted Oberhauser of money laundering for the transfer.

In overturning the jury's verdict, the district court recognized "there [was] no credible evidence to suggest that there was ever a legitimate [Treasury-bill] leasing program or that any of the so-called documents supposedly verifying the program were authentic." Nevertheless, the court stated that regardless of the source of the funds and regardless of whether the $160,000 that was deposited in August was the same $160,000 that was paid out in November, there was insufficient evidence for a reasonable jury to conclude that when the transfers were made, Oberhauser knew the money represented the proceeds of some form of unlawful activity. Although there was circumstantial evidence in the case suggesting Oberhauser knew in April 1997 that the money represented the proceeds of unlawful activity, there was no evidence he had such knowledge in the fall of 1996. The court noted that both transfers occurred so early in the fraudulent scheme that there was no basis by which the Government could argue Oberhauser turned a blind eye or otherwise deliberately avoided criminal knowledge, even though the court had given the jury our model willful blindness instruction. The court did not doubt that Oberhauser's role changed and his level of knowledge was quite different after all funds were disbursed and various problems were encountered with the program beginning in the early part of 1997. The court also stated there was insufficient evidence for a reasonable jury to conclude Oberhauser intended to promote the carrying on of wire fraud and mail fraud. Following our decision in Jolivet, 224 F.3d at 909, the district court rejected the Government's argument that mere acceptance of funds into the trust account was sufficient to convict of Oberhauser of promotional money laundering, and stated acceptance of a wire transfer does not show criminal intent and criminal knowledge when Oberhauser did not control the deposits going into the account.

The Government contends the knowledge element in both counts is proved by direct proof of Oberhauser's understanding of the fraudulent nature of K-7's Treasury bill leasing program or his willful blindness to such facts. Viewing the evidence in the light most favorable to the Government, we conclude a reasonable jury could infer that when Oberhauser engaged in the financial transactions for which he was

-6-

convicted, he knew the transferred funds were the proceeds of unlawful activity and he intended to promote the carrying on of the unlawful activity.

Even if Oberhauser did not know about K-7's fraudulent nature when he was first retained, a reasonable jury could find he knew K-7's program was not legitimate six months later, by August 28, 1996, and instead of withdrawing, continued as a willing participant in the scheme in return for substantial compensation. See United States v. Anderskow, 88 F.3d 245, 252-53 (3d Cir. 1996) (holding evidence sufficient to support money laundering conviction of attorney who held and disbursed funds from his escrow account for a crooked financier client). From the beginning, K-7's investment program promised highly improbable returns. Oberhauser himself did not invest in the program. Oberhauser drafted the Treasury-bill leasing program documents. Oberhauser contracted directly with investors, and violated his contractual duty to them by transferring funds out the trust account before the full $5.5 million was reached and by holding their money in excess of the contractual grace period of sixty days. Further, Oberhauser was financially motivated to earn attorney's fees from K-7 and to receive a percentage of any successful deals. The jury could reasonably find that Oberhauser was willfully blind because he knew of a high probability that the K-7 program was fraudulent and deliberately avoided learning the truth. See United States v. Lalley, 257 F.3d 751, 755 (8th Cir. 2001). As for the November 1996 transaction, Oberhauser argues the transfer to charity was a "benign expenditure" even if the funds were from an unlawful activity, United States v. Brown, 186 F.2d 661, 666 (5th Cir. 1999), but the jury could reasonably find otherwise. Because K-7 induced investors to give them money by stating their profits went to charity and by prominently displaying plaques commemorating their contributions, the transfer to the charity promoted continuation of the fraud scheme. We thus conclude sufficient evidence supports Oberhauser's convictions.

The Government also argues the district court abused its discretion in conditionally granting a new trial. Oberhauser has moved to strike this argument

asserting we lack jurisdiction to consider it because the Government's notice of appeal references only the district court's motion for judgment of acquittal. We construe notices of appeal liberally in favor of jurisdiction, particularly when there is no prejudice to the adverse party and the parties have briefed the issue. Greer v. St. Louis Regional Med. Ctr., 258 F.3d 843, 846 (8th Cir. 2001); Sather v. IRS, 251 F.3d 1168, 1172 (8th Cir. 1997). Here, Oberhauser does not assert any prejudice and has briefed the issue's merits. We thus deem the notice of appeal sufficient, and deny Oberhauser's motion to strike the Government's argument.

The district court granted the new trial because the "verdicts [were] contrary to the weight of the evidence . . . particularly when the newly discovered evidence . . . is considered." The newly discovered evidence consisted of nine documents that were contained in the government's discovery and accessible to defense counsel before and during trial, contained in about 400,000 pages of seized or subpoenaed documents. A motion for a new trial based on newly discovered evidence cannot be granted unless, among other things, the evidence is discovered after the trial. United States v. Liebo, 923 F.2d 1308, 1313 (8th Cir. 1991). We have refused to excuse a defendant's failure to discover available records despite his claim that "the documents were part of a 400,000-page document repository which he did not have time to examine document by document." United States v. Tierney, 947 F.2d 854, 863 (8th Cir. 1991). Given this controlling authority, we conclude the district court abused its discretion in granting a new trial based on newly discovered evidence.

In sum, we reverse the district court's grant of judgment of acquittal to Oberhauser and reinstate the jury's verdict convicting him. We also reverse the district court's grant of a new trial. We remand for further proceedings consistent with this opinion.

A true copy.

Attest:

　　　　　CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.