In re PETITION FOR DISCIPLINARY ACTION AGAINST Louis B. OBERHAUSER, Jr., a Minnesota Attorney, Registration No. 80408.

No. C9–93–1342.

Supreme Court of Minnesota.

May 13, 2004.

Kenneth L. Jorgensen, Director, Office of Lawyers Professional Responsibility, Timothy M. Burke, Senior Assistant Director, St. Paul, MN, for petitioner.

Jack Neveaux, Wayzata, MN, for Respondent.

## OPINION

PER CURIAM.

Louis B. Oberhauser, Jr., an attorney licensed to practice in Minnesota, was convicted in United States District Court of two counts of felony money laundering. Following the Eighth Circuit's review on appeal and the district court's subsequent imposition of sentence, the Director of the Office of Lawyers Professional Responsibility petitioned for disbarment. A referee found that Oberhauser's conduct violated Minnesota Rules of Professional Conduct 8.4(b) and (c) and recommended disbarment. Oberhauser does not dispute that his conduct violated the rules, but argues that the disciplinary sanction for his misconduct should be less than the recommended disbarment or the alternative possibility of indefinite suspension. Following a thorough review of the record, we con-

clude that the appropriate sanction for Oberhauser's misconduct is disbarment.

In January 1996, Louis B. Oberhauser, Jr., an attorney duly licensed to practice law in the state of Minnesota, became acquainted with Richard Gravatt and Joe King. Following a meeting, Oberhauser agreed to Gravatt and King's request that Oberhauser's law office be the disbursing agent for their investment business. Oberhauser also agreed to represent Gravatt and King in several real estate transactions. Oberhauser eventually helped Gravatt and King incorporate an entity named "K–7," through which the two men conducted their investment business. In addition, at the request of Gravatt and King, Oberhauser opened an additional trust account[1] at a larger bank than the one where his firm's existing trust account was held. He did this in order to accommodate K–7's international money market activities. Oberhauser used this additional trust account exclusively for K–7 transactions.

Gravatt and King subsequently asked Oberhauser to run an investment trading program. The program was described by the United States Court of Appeals for the Eighth Circuit as follows:

> [the] trading program was a "roll program" in which the company would supposedly trade $100 million in treasuries making a small percentage on every trade, which through a multiplication factor would yield a large income. Gravatt said the Treasury bills could not be leased until the company had $5.5 million in investment money. According to cash investment sheets provided to investors, the $5.5 million total investment would be used to lease $100,000,000 in Treasury bills, and trades on those bills would yield $2,000,000 per trade and $900,000 per trade to investors, with a weekly amount to investors of $3,600,000. Rental fees of $13,750,000 and a set up fee of $3,000,000 would be paid. For a participant investing $50,000 towards the $5.5 million, the total treasury amount would be $909,091, the yield per trade would be $18,182, the yield per trade to [the] investor would be $8[,]182, the weekly amount to the investor would be $28,459, and the net amount to the investor would be $1,166,818. At trial, the Government's expert witness testified the program's claims amounted to a preposterous 2000% return. To make the program attractive to employees and investors, profits from the trading program were to go to the charity ChildHelp.

*United States v. Oberhauser,* 284 F.3d 827, 830 (8th Cir.), *reh'g and reh'g· en banc denied, cert. denied,* 537 U.S. 1071, 123 S.Ct. 671, 154 L.Ed.2d 565 (2002). The record does not clearly indicate what specific knowledge Oberhauser had about this program. Oberhauser stated that he told Gravatt and King he would not run the program, but he was willing to act as an escrow agent to receive and distribute the program's funds. Oberhauser drafted an escrow agreement, a letter of authorization to act on behalf of investors, and an agreement of procedures. He began receiving funds from investors into his K–7 trust account, but had no other contact with investors.

According to the Eighth Circuit's review of the evidence submitted at Oberhauser's federal trial, his involvement with K–7 during 1996 took various forms in addition to

---

1. This was an Interest on Lawyers Trust Account (IOLTA). The IOLTA program requires lawyers and law firms to pool nominal and short-term client funds into trust accounts with the interest being paid to the Lawyers Trust Account Board. *See* Minn. R. Prof. Conduct 1.15(e).

acting as an escrow agent. In April 1996, Gravatt promised Oberhauser 1% of any deal if Oberhauser helped arrange a stand-by letter of credit in the amounts of $9, $18, or $27 million. *Oberhauser*, 284 F.3d at 830. In August 1996, Gravatt and King discussed with Oberhauser the preparation of an employment "termination contract" for a woman hired by K–7 to be Gravatt's girlfriend. *Id.* at 830–31. That same month, Oberhauser prepared a letter related to K–7's attempt to buy a $10 million office building. *Id.* at 831. In the fall of 1996, a K–7 employee overheard Gravatt and King discuss that Oberhauser "was going to 'make $20 million on this deal,' and later asking Oberhauser what he was going to do with all those millions." *Id.* The record shows that Oberhauser re-drafted contracts related to a $2.5 million investment by an individual named Gordon Groves. *Id.* It further shows Oberhauser transferred funds from the K–7 trust account for leasing Treasury bills and transferred the funds directly to K–7. *Id.* After the Treasury bill lease was settled and Groves released $2.5 million to the K–7 trust account, Oberhauser transferred $2.4 million as a broker's commission to K–7, as well as another $100,000 to K–7. *Id.*

On August 27, 1996, King contacted Oberhauser and told him that he had made an agreement with a charity named ChildHelp to fund the construction of a gymnasium in Beaumont, California. ChildHelp is a national charity with its main focus in the area of child abuse prevention and treatment.[2] King wanted to put $160,000 in escrow until the gymnasium was completed and, as a result, $160,000 from K–7's corporate account, which operated under the name Group Resources, was deposited in the K–7 trust account. On November 25, at the request of ChildHelp, Oberhauser transferred the $160,000 to ChildHelp's bank account in California.

Ultimately, investors in K–7's program lost over $11 million.. *Oberhauser*, 284 F.3d at 829. The federal government indicted Gravatt, King, and four others on 89 counts of criminal conduct, including conspiracy, wire fraud, money laundering, and conducting a continuing financial crime enterprise. *Id.* On January 6, 2000, Oberhauser was added as a criminal defendant in a superseding indictment. He was charged with 66 counts, including conspiracy, wire fraud, mail fraud, and money laundering. Oberhauser and Gravatt were the only defendants in this matter to plead not guilty and they were tried jointly in federal district court. *Id.* at 829. At trial, an Internal Revenue Service (IRS) agent testified that the transfer of the $160,000 to ChildHelp was money laundering because it made the money appear to be the proceeds of a successful deal. *Id.* at 831. Gravatt was found guilty by a jury, convicted on 68 counts, and sentenced to 262 months in federal prison. *Id.* at 829. Oberhauser was found guilty by the jury and convicted on two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (2000)[3] for the Chil-

---

2. For more information, see *http://www.childhelpusa.org* (last visited May 4, 2004).

3. 18 U.S.C. § 1956. Laundering of monetary instruments.

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity;
>
> \* \* \* \*
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

dHelp transfers, but was acquitted on the other 64 counts. *Id.*

The district court granted Oberhauser's subsequent motion for acquittal on both counts on the ground that the convictions were not supported by the evidence. *United States v. Oberhauser,* 142 F.Supp.2d 1118, 1130–31 (D.Minn.2001). On appeal, the Eighth Circuit reversed. *Oberhauser,* 284 F.3d at 833. After summarizing the evidence against Oberhauser, the circuit court concluded that even if Oberhauser did not know the fraudulent nature of K–7 when he was first retained, "a reasonable jury could find he knew K–7's program was not legitimate" by the time of the ChildHelp transactions. *Id.* at 832. The court observed that Oberhauser "was financially motivated to earn attorney's fees from K–7 and to receive a percentage of any successful deals." *Id.* The court also observed that a jury could reasonably find that Oberhauser "was willfully blind because he knew of a high probability that the K–7 program was fraudulent and deliberately avoided learning the truth." *Id.* In response to Oberhauser's claim that the transfer to ChildHelp was a "benign expenditure," the court stated that the transfer to the charity promoted the fraudulent scheme because K–7 induced investors to give them money "by stating their profits went to charity and by prominently displaying plaques commemorating their contributions * * *." *Id.*

At sentencing after remand, the district court granted Oberhauser a sentencing guidelines role reduction because of his limited participation in K–7's scheme, but denied a reduction for acceptance of responsibility and found an abuse of trust because the ChildHelp transactions were used to lull investors into a sense of security. The court stated that Oberhauser's responsibility was "not to blindly follow Mr. King's advice," especially when he knew of his own lack of knowledge regarding securities. Nevertheless, the court granted Oberhauser's motion for a downward sentencing departure. The court sentenced Oberhauser to two 15 month concurrent terms of imprisonment, two concurrent two-year terms of supervised release, 400 hours of community service, and ordered him to pay $160,000 in restitution.

Following the Eighth Circuit's reinstatement of Oberhauser's convictions, the Director of the Office of Lawyers Professional Responsibility initiated disciplinary proceedings against Oberhauser. The Director alleged that Oberhauser's conduct violated Minn. R. Prof. Conduct 8.4(b) and (c). "It is professional misconduct for a lawyer to: * * * (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation * * *." Minn. R. Prof. Conduct 8.4(b) & (c). On July 14, 2003, we temporarily suspended Oberhauser from the practice of law.

On September 12, 2003, a hearing was held before a referee we appointed to make findings of fact and recommendations for disposition of the matter. At the hearing, Oberhauser testified regarding his background and the events related to his convictions. He described his civic involvement as a Rotary Club member and officer and as a former mayor of Orono, Minnesota. He also described his service on his church's parish council and his membership with and service as an officer of the Wayzata Country Club. Oberhauser testified that several documents regarding the ChildHelp transactions were not offered at his trial and he speculated that the outcome might have been different had these documents been used.[4] Oberhauser

---

4. These documents contain King's instruction to Oberhauser to place the $160,000 in an

testified that he did not receive any personal benefits from the K–7 investment activities, but acknowledged that he billed K–7 $130,000 for legal work and collected $80,000 of this amount. Two character witnesses appeared on Oberhauser's behalf. Oberhauser also submitted copies of more than 140 letters of support that family members, friends, and acquaintances had sent to the district court prior to sentencing.

The Director presented evidence that Oberhauser has been disciplined on five prior occasions. On June 22, 1988, Oberhauser was admonished for failing to promptly transfer his clients' file to their new attorney. On August 11, 1988, he was placed on private probation for two years for neglecting client matters and failing to keep his clients informed of the status of those matters. On December 2, 1993, he was publicly reprimanded for obtaining payment for the release of an invalid lien that he had placed on his client's homestead for work billed in 1973. *In re Oberhauser*, 508 N.W.2d 521 (Minn.1993). On March 2, 1995, Oberhauser was admonished for failing to respond to multiple discovery requests in a title registration proceeding, failing to communicate with a client, and failing to return an abstract to a client for six months. On July 2, 1998, we suspended Oberhauser from the practice of law for 90 days for misrepresentations to the IRS, the Minnesota Department of Revenue, and the Director of the Lawyers Professional Responsibility Board; backdating a tax return; and failing to timely file federal and state tax returns. *In re Oberhauser*, 581 N.W.2d 309, 310 (Minn. 1998). We reinstated Oberhauser on November 4, 1998. *In re Oberhauser*, 585 N.W.2d 790, 790 (Minn.1998).

Following the hearing, the referee concluded that Oberhauser's conduct violated Minn. R. Prof. Conduct 8.4(b) and (c). The referee found three aggravating factors: (1) Oberhauser's disciplinary history, (2) Oberhauser's pecuniary motive, and (3) Oberhauser's substantial experience in the practice of law. The referee noted that Oberhauser's claim of mitigating factors— evidence of good character and his role in K–7—did not outweigh the likelihood that he would engage in unethical or illegal conduct in the future. The referee recommended Oberhauser be disbarred or, alternatively, "should the Court find adequate mitigating circumstances," that Oberhauser's license be indefinitely suspended.

■ Oberhauser does not contest the conclusion that he violated Rules 8.4(b) and (c). Instead, he focuses on what is an appropriate sanction and suggests that lifting his current suspension from the practice of law following release from prison, followed by two years of supervision, is sufficient discipline.[5] According to Oberhauser's brief, he was scheduled for re-

irrevocable trust for ChildHelp, Oberhauser's communications with ChildHelp regarding the funds, trust account statements, and money transfer documents. Although the documents were among those seized and subpoenaed by the government for the trial, neither the government nor Oberhauser introduced the documents at trial.

5. Oberhauser's only challenge to the referee's findings and conclusions is contained in a footnote to his brief where he disputes the conclusion that pecuniary motive aggravated his misconduct. Oberhauser suggests that this conclusion is unfounded and erroneous in light of the referee's finding of fact that Oberhauser "may have had a pecuniary motive." However, the Eighth Circuit concluded that Oberhauser was financially motivated to earn attorney fees, a percentage from successful deals, and that Oberhauser received $80,000 and was owed another $50,000 in fees from his work for K–7. There is ample evidence to support the referee's finding; therefore, we conclude that this finding is not clearly erroneous.

lease last month, so his argument is for immediate reinstatement to the practice of law.

In considering a petition for attorney discipline, we do not set aside the findings and conclusions of a referee unless they are clearly erroneous. *In re Singer*, 541 N.W.2d 313, 315 (Minn.1996). While we place significant weight on the referee's recommendation for discipline, we have the final responsibility of determining the appropriate discipline to impose. *Id.* The purposes of disciplinary sanctions for professional misconduct are to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys. *In re Daffer*, 344 N.W.2d 382, 385 (Minn.1984).

We consider four general factors in determining the appropriate sanction: "1) the nature of the misconduct, 2) the cumulative weight of the violations of the rules of professional conduct, 3) the harm to the public, and 4) the harm to the legal profession." *Singer*, 541 N.W.2d at 316 (citing *In re Beal*, 374 N.W.2d 715, 719 (Minn.1985)). Disciplinary sanctions are imposed on a case-by-case basis after considering both aggravating and mitigating circumstances, as well as looking to similar cases for guidance. *In re Koss*, 611 N.W.2d 14, 16 (Minn.2000). An attorney's criminal conviction is "conclusive evidence that the [attorney] committed the conduct for which the [attorney] was convicted." Minn. R. Lawyers Prof. Resp. 19(a).

Although Oberhauser attempts to minimize his role in K–7, we cannot ignore the presumption created by Rule 19(a) of the Minnesota Rules on Lawyers Professional Responsibility that Oberhauser committed the acts underlying his conviction. *See In re Dvorak*, 554 N.W.2d 399, 402 (Minn.1996) (holding attorney presumed to have committed the acts underlying a plea of guilty). The criminal act of money laundering for which Oberhauser was convicted involves a specific culpable state of mind. *See* 18 U.S.C. § 1956(a)(1)(A)(i). Thus, Oberhauser's conviction for money laundering reflects the jury's conclusion that Oberhauser both knew the funds were the proceeds of an unlawful activity and intended to promote the unlawful activity via the transaction. Rule 19(a)'s presumption lends itself to the additional presumption that, as here, when the criminal conduct includes a specific state of mind, the conviction is conclusive evidence that the lawyer acted with that state of mind. Therefore, because of Oberhauser's convictions, we must presume that he both knew that the funds in the ChildHelp transaction were the proceeds of an unlawful activity and that he intended to promote the unlawful activity via the ChildHelp transaction. Moreover, we do not question the Eighth Circuit's decision affirming the conviction based on a conclusion that the jury could have reasonably found that Oberhauser knew of K–7's fraudulent nature by the time of the ChildHelp transactions and he continued to be a willing participant in the scheme. *Oberhauser*, 284 F.3d at 832.

The conduct for which Oberhauser was convicted—two counts of felony money laundering—is very serious. At the sentencing hearing, a victim of K–7's scheme testified that he invested his savings with K–7 only after verifying the reputation and standing of Oberhauser's law firm in the community. The federal district court found an abuse of trust on Oberhauser's part because of his role as an attorney in lending legitimacy to K–7's scheme. Oberhauser's involvement with K–7 occurred because of his license to practice law in Minnesota. By knowingly acting to further the criminal activity that eventually cost its victims $11 million, Oberhauser not only contributed to the actual harm suf-

fered, but caused harm to the public's confidence in and regard for the legal profession.

Moreover, we agree with the referee's conclusion that Oberhauser's past history of professional discipline is an aggravating factor. We have held that the cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline. *In re Geiger*, 621 N.W.2d 16, 23 (Minn. 2001). Here, Oberhauser's misconduct combined with his disciplinary history warrants disbarment.

Finally, we do not find any mitigating circumstances not considered by the referee, nor do we give those presented by Oberhauser any more weight than did the referee. That Oberhauser has the support of family, many friends, and acquaintances does not outweigh the seriousness of his conduct, his history of failure to abide by the rules of professional conduct, the pecuniary motive underlying his involvement with K–7, and the fact that he was an experienced attorney.

Accordingly, we agree with the referee that disbarment is appropriate and hereby disbar Louis B. Oberhauser, Jr. from the practice of law in the State of Minnesota.

Disbarment ordered.