### In re Petition for DISCIPLINARY ACTION AGAINST Angela Montgomery MONTEZ (n/k/a Angela Montgomery), a Minnesota Attorney, Registration No. 322192.

No. A11–0125.

Supreme Court of Minnesota.

Feb. 22, 2012.

Martin A. Cole, Director, Cassie Hanson, Senior Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, MN, for petitioner.

Angela Montgomery, Omaha, NE, pro se.

## OPINION

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for discipline against respondent Angela Montgomery Montez, now known as Angela Montgomery,[1] alleging numerous violations of the Minnesota Rules of Professional Conduct. The petition alleged that Montgomery's failure to place an advance fee payment in trust; failure to remit unearned client fees; false statements to the client, to successor counsel, to a fee arbitration panel, and to the Director; and failure to comply with a binding fee arbitration award violated Minn. R. Prof. Conduct 1.15(a)[2] and (c)(4),[3] 4.1,[4] and 8.4(c),[5] (d),[6] and (i).[7] The petition also alleged that Montgomery's failure to cooperate with the Director's investigation violated

---

1. After this disciplinary proceeding was started, respondent's marriage was dissolved and respondent resumed using her maiden name. We therefore refer to her by her maiden name ("Montgomery") in this opinion.

2. Rule 1.15(a), Minn. R. Prof. Conduct, requires that "[a]ll funds of clients or third persons held by a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts."

3. Rule 1.15(c)(4), Minn. R. Prof. Conduct, provides that a lawyer shall "promptly pay or deliver to the client or third person as requested the funds, securities, or other properties in the possession of the lawyer which the client or third person is entitled to receive."

4. Rule 4.1, Minn. R. Prof. Conduct, prohibits a lawyer from knowingly making "a false statement of fact or law" in the "course of representing a client."

5. Rule 8.4(c), Minn. R. Prof. Conduct, provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

6. Rule 8.4(d), Minn. R. Prof. Conduct, provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

7. Rule 8.4(i), Minn. R. Prof. Conduct, provides that it is professional misconduct for a lawyer to "refuse to honor a final and binding fee arbitration award after agreeing to arbitrate a fee dispute."

Rule 25,[8] Rules on Lawyers Professional Responsibility (RLPR), and Minn. R. Prof. Conduct 8.1(a)[9] and (b).[10] After an evidentiary hearing, the referee we appointed found that Montgomery had committed the professional misconduct alleged in the petition. The referee recommended that Montgomery be suspended from the practice of law and ineligible to petition for reinstatement for a minimum of 2 years. We conclude that the referee properly interpreted the Rules of Professional Conduct and that Montgomery's misconduct, as found by the referee, warrants indefinite suspension from the practice of law with no right to petition for reinstatement for a minimum of 2 years.

Respondent Angela Montgomery was admitted to practice law in Minnesota on October 25, 2002. Montgomery describes herself primarily as a public interest attorney, and since her admission, she has represented private clients on only two occasions. The representation of one of her private clients gives rise to the current disciplinary charges.

In 2009, Montgomery was retained by Better Future Adoption Services (BFAS), a non-profit organization, to represent the organization in a defamation suit brought by a former BFAS employee. Pursuant to a written retainer agreement dated June 15, 2009, BFAS was to pay Montgomery a "total fixed fee of $5000 payable in a 20% upfront retainer and equal monthly payments of $1,000 for a period of 4 months." Montgomery was to provide BFAS with an accounting of her time and expenses and, in the event that Montgomery provided work beyond the $5,000 value, the agreement specified that BFAS would compensate her at the rate of $75 per hour.

Despite the terms of the retainer agreement, the then-chair of the BFAS board of directors issued a check payable to Montgomery in the amount of $5,000 with the annotation "Atty Fees (4 months)." Montgomery did not place the $5,000 in a trust account and testified before the referee that she has never maintained a trust account satisfying the requirements of Minn. R. Prof. Conduct 1.15.

A few weeks after the retainer agreement was signed, the individual who had issued the check to Montgomery left the BFAS board of directors. In reviewing financial transactions in which that individual had been involved, BFAS discovered that Montgomery had been issued a check for the full $5,000, instead of the $1,000 initial payment set forth in the June 15, 2009, fee agreement. At a meeting scheduled by BFAS's executive director to discuss return of the unearned portion of the retainer, the executive director told Montgomery that the payment of the full $5,000 was fraudulent. Montgomery disagreed and denied any wrongdoing. Following the meeting, BFAS decided to terminate Montgomery's representation and retained a new attorney to represent it.

The day after the meeting between BFAS and Montgomery, BFAS's new at-

---

**8.** Rule 25, RLPR, requires that a lawyer who is the subject of an investigation or proceeding under the Rules of Professional Conduct comply with requests to furnish documents and explanations, appear for conferences and hearings, and execute authorizations and releases as necessary to facilitate the investigation.

**9.** Rule 8.1(a), Minn. R. Prof. Conduct, provides that in connection with a disciplinary

matter, an attorney shall not "knowingly make a false statement of material fact."

**10.** Rule 8.1(b), Minn. R. Prof. Conduct, provides that in connection with a disciplinary matter, an attorney shall not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from a[] ... disciplinary authority."

torney sent Montgomery a letter terminating her representation, asking that Montgomery send him the client file, and requesting an opportunity to discuss with Montgomery the issue of the unearned portion of the retainer. Montgomery sent BFAS's new attorney the file and stated she believed she was entitled to retain the entire BFAS retainer. BFAS's new attorney responded and requested that Montgomery place the disputed portion of the retainer into a trust account and suggested that the issue of Montgomery's fees be submitted to the Hennepin County Bar Association's fee arbitration panel. Montgomery told BFAS's new attorney she was "in agreement with depositing $2000 in trust pending a binding fee arbitration decision." But Montgomery did not deposit any portion of the BFAS retainer into a trust account.

The parties thereafter submitted the fee dispute to binding arbitration through the Hennepin County Bar Association's fee arbitration process. Montgomery maintained throughout the arbitration proceedings that she had deposited $2,000 in a trust account. Montgomery also contended that she was entitled to the full $5,000 upon her retainer as BFAS's counsel. To support this contention, Montgomery offered as an exhibit a different version of the June 15, 2009, fee agreement, one in which some payment terms had been crossed out and others added as follows:

A total fixed fee of $5,000, ~~payable in a 20% upfront retainer and equal monthly payments of $1,000 for a period of 4 months~~ + *after 4 mos monthly payments of $1,200.*

Neither BFAS's executive director nor its new attorney had ever seen this version of the agreement and the referee later found that Montgomery had altered it in order to mislead the arbitration panel. In December 2009, the arbitration panel concluded that Montgomery was entitled to compensation for 14 hours of legal work at $125 per hour (a total of $1,750), and awarded BFAS a refund of the balance of the retainer.

On December 7, 2009, BFAS's new attorney requested payment of the fee arbitration award. Almost a month later, Montgomery responded by e-mail:

I advised you during our last telephone conversation that I would send the award amount to BFAS. Accordingly, I will arrange for a check to be transferred to BFAS from the [mutual fund] account. I will then need to arrange a payment next month for the remainder of the award. Please refrain from further correspondence on this matter.

But Montgomery never made any payments toward the arbitration award. On December 23, 2009, BFAS's new attorney submitted a complaint against Montgomery to the Office of Lawyers Professional Responsibility.

During the disciplinary proceedings, Montgomery made a number of representations to the Director that the referee found to be false and inconsistent with the documentary evidence in the case. Montgomery told the Director that she did not maintain a pooled client trust account, apparently because she did not regularly handle client funds, but claimed to maintain a mutual fund account for business expenses that satisfied the requirements for a trust account. Montgomery claimed to have placed all or some of the BFAS retainer into that mutual fund account. Montgomery redacted statements for the account that concealed from the Director the fact that it was an individual retirement account. Montgomery also concealed from the Director the fact that the account statements she produced were not complete. The referee rejected as not credible Montgomery's testimony that she

had not altered the mutual fund statements and found that Montgomery had altered the statements in order to mislead the Director and conceal Montgomery's failure to place client funds in an appropriate trust account.

Montgomery also made repeated false representations to the Director regarding her handling of the BFAS retainer. In one letter to the Director in April 2010, Montgomery represented that she had deposited $2,000 of the retainer in her mutual fund account. In a second letter to the Director later in April, Montgomery represented that she had deposited $2,000 of the retainer in her mutual fund account and was "adding funds" to the account as she was able in order to cover the entire fee arbitration award. In June, Montgomery told the Director she had deposited the entire $5,000 retainer in her mutual fund account, of which $2,000 was earmarked for payment of the arbitration award. The referee found all of these representations to be false, and that none of the BFAS retainer was ever deposited in Montgomery's mutual fund account.[11]

Montgomery also made false and conflicting statements with respect to her ability to pay the arbitration award. During the Director's investigation of the disciplinary complaint, Montgomery claimed she was unable to pay the arbitration award "because she was in the midst of a divorce and prohibited from depleting any of her assets." This assertion was false for two reasons. First, there was no district court order in Montgomery's marital dissolution case that prohibited her from disbursing funds from a client trust account. Second, during the marital dissolution proceedings,

Montgomery withdrew substantially all of the funds from the account into which she claimed to have deposited the BFAS retainer. Montgomery also made conflicting arguments about her ability to pay the arbitration award during oral argument at our court. On the one hand, Montgomery asserted that she was unable to pay the arbitration award because she was living off unemployment benefits and did not have the funds to pay the award. On the other hand, Montgomery claimed that she had the ability to pay the award and had attempted several times to make payment arrangements, but did not know where to remit payment.

Montgomery also made false representations regarding the BFAS retainer agreement. Montgomery submitted to the Director the same altered version of her retainer agreement with BFAS that she had presented to the arbitration panel. BFAS had never received or seen this version of the agreement prior to arbitration. The referee found that Montgomery had altered the retainer agreement in order to mislead the arbitration panel regarding her entitlement to the entire $5,000.

In addition to her false statements, Montgomery failed to cooperate with the Director during the investigation. She routinely failed to timely respond to communications from the Director, and failed to timely or completely produce requested documents regarding the mutual fund account and her impending divorce. In August 2010, Montgomery notified the Director that she was moving to Nebraska, but did not notify the Director of her new

---

11. At the hearing before the referee, Montgomery testified that she "could not remember where she deposited the $5,000 she received from BFAS or how she disbursed the funds." But during oral argument before our court, Montgomery asserted that she "believed in good faith that that check went into the ... mutual account." She also suggested that BFAS's retainer had been misappropriated by her bank, or that the retainer check had been taken from her and deposited in an unknown location.

address until the end of September, causing several communications from the Director to be returned by the post office. Despite receiving e-mails from the Director, and ultimately the mailed communications, Montgomery still had not provided substantive responses to a number of the Director's requests for information by the time of the referee's evidentiary hearing.

On November 15, 2010, the Director mailed charges of unprofessional conduct to Montgomery at her new address in Nebraska. Montgomery failed to timely answer the charges as required by Rule 9(a)(1), RLPR. After providing Montgomery with additional time to respond and receiving no response, the Director filed a petition for disciplinary action with our court.

On January 12, 2011, Montgomery was personally served with the petition for disciplinary action. We appointed a referee to hear the matter. Montgomery continued to be uncooperative with the disciplinary proceedings, failing to timely respond to the Director's discovery requests and to comply with the referee's pretrial orders regarding discovery, witness lists, and exhibits.

After an evidentiary hearing, the referee concluded that Montgomery's conduct violated Minn. R. Prof. Conduct 1.15(a) and (c)(4), 4.1, 8.1(a) and (b), 8.4(c), (d), and (i), and Rule 25, RLPR. The referee made no findings or conclusions as to any aggravating or mitigating factors. As discipline, the referee recommended an indefinite suspension from the practice of law for a minimum of 2 years.

Before our court, Montgomery argues that BFAS's complaint to the Director was premature because BFAS did not first commence legal action to recover the arbitration award. Montgomery also argues that the referee erred in concluding that she violated Minn. R. Prof. Conduct 1.15.

For his part, the Director argues that the referee erred in failing to find aggravating factors. Finally, the parties dispute the discipline appropriate for Montgomery's misconduct.

Neither the Director nor Montgomery ordered a transcript of the referee's hearing. Rule 14(e), RLPR provides: "Unless the respondent or Director, within ten days, orders a transcript and so notifies this Court, the findings of fact and conclusions [made by the referee] shall be conclusive." *See also In re Karlsen*, 778 N.W.2d 307, 311 (Minn.2010); *In re Ryerson*, 760 N.W.2d 893, 900 (Minn.2009) ("When, as in this case, neither party orders a transcript within ten days of the referee's order, the referee's findings of facts and conclusions of law are conclusive.").

We acknowledge that our prior case law on the breadth and application of Rule 14(e) has not always been consistent. For example, where neither party has ordered a transcript, we have sometimes disregarded the parties' challenges to the referee's findings and conclusions, and determined only the appropriate discipline in light of those findings and conclusions. *See, e.g., In re Moore*, 692 N.W.2d 446, 449–50 (Minn.2005); *In re Oberhauser*, 679 N.W.2d 153, 159 (Minn.2004). In other instances, we have indicated that the ordering of a transcript affects only the "right to challenge the referee's factual findings." *In re Graham*, 609 N.W.2d 894, 896 (Minn.2000). In still other instances, we have addressed whether the facts, as found by the referee, support the referee's conclusions regarding rule violations and the presence or absence of aggravating or mitigating factors. *See, e.g., Karlsen*, 778 N.W.2d at 312 (examining whether aggravating or mitigating factors were present where no transcript was ordered and the referee had concluded that no aggravating

or mitigating factors existed); *Ryerson,* 760 N.W.2d at 902 (declining to consider mitigating factors where no transcript had been ordered because the facts found by the referee did not support the conclusion that mitigating factors were present); *In re Perez,* 688 N.W.2d 562, 568–69 (Minn. 2004) (reviewing the facts found by the referee to determine whether those facts supported a finding of multiple aggravating circumstances, even though no transcript had been ordered and the referee had made no conclusions that aggravating factors were present).

 Under Rule 14(e), RLPR, we accept a referee's factual findings as conclusive. We accept such findings as conclusive "because we cannot review the evidence supporting" them without a transcript. *In re Dedefo,* 781 N.W.2d 1, 7 (Minn.2010); *see also In re Anderson,* 759 N.W.2d 892, 895–96 (Minn.2009) (explaining that we give deference to a referee's factual findings especially where the referee's findings rested on disputed testimony or an attorney's "demeanor, credibility, or sincerity" because of the referee's unique position to find such facts). We must similarly accept as conclusive the conclusions that the referee draws from the facts, such as whether the attorney's conduct violated the Rules of Professional Conduct, when no transcript has been ordered. We will, however, review the referee's interpretation of the Rules of Professional Conduct, and other conclusions of law that do not rely on the referee's factual findings, de novo, whether or not a transcript is part of our record on review. Finally, we retain ultimate responsibility for determining appropriate discipline. *See In re Rebeau,* 787 N.W.2d 168, 173 (Minn.2010). With this standard of review in mind, we turn to the parties' arguments.

## I.

We turn first to Montgomery's contention that BFAS improperly filed a complaint with the Director of the Office of Lawyers Professional Responsibility to induce Montgomery to pay the arbitration award. The basis of Montgomery's argument is that the Rules of Professional Conduct do not allow a client to file a complaint alleging a violation of Minn. R. Prof. Conduct 8.4(i) before taking other legal measures to collect an arbitration award. To support this proposition, Montgomery cites comment 20 in the "Scope" portion of the Rules of Professional Conduct, which provides that the "purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons." Scope, Minn. R. Prof. Conduct, cmt. 20. That "a rule is a just basis ... for sanctioning a lawyer under the administration of a disciplinary authority[ ] does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule." *Id.* Because of BFAS's allegedly improper use of the Rules of Professional Conduct, Montgomery argues that rather than making arrangements to pay the arbitration award, she "is fighting to maintain her license to practice law."

Montgomery's argument requires an interpretation of whether the Rules of Professional Conduct require a client to seek other recourse before filing a complaint with the Director based on an attorney's failure to comply with a binding fee arbitration award. The proper interpretation of the rules presents a question of law that we review de novo. *Lennartson v. Anoka– Hennepin Indep. Sch. Dist. No. 11,* 662 N.W.2d 125, 129 (Minn.2003).

 The import of the comment cited by Montgomery is that an attorney's violation of the Rules of Professional Conduct does not give rise to a private cause of

action against an attorney. *See L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn.1989) (concluding that even though the attorney owed an ethical duty to disclose information to a tribunal, his failure to disclose was not actionable fraud upon which his client's adversaries could sue). But the scenario contemplated by the comment is not present here. BFAS did not attempt to use Montgomery's rule violation to seek additional private liability. Rather, BFAS filed a complaint with the Director based on Montgomery's misconduct with respect to the arbitration proceedings. While Montgomery is correct that to obtain payment of the arbitration award BFAS could have filed a district court judgment, the availability of an alternative remedy does not preclude BFAS from filing a complaint with the Director.

■ Moreover, the Scope comments are merely intended "to provide general orientation," whereas, "the text of each rule is authoritative." Scope, Minn. R. Prof. Conduct, cmt. 21. Minnesota Rule of Professional Conduct 8.4(i) specifically states that it is professional misconduct for an attorney to "refuse to honor a final and binding fee arbitration award after agreeing to arbitrate a fee dispute." Montgomery's conduct in refusing to comply with an arbitration award will result in discipline, even if the strictures of the Scope section have not been precisely followed. We therefore reject Montgomery's proposed interpretation of the Rules of Professional Conduct and hold that a client need not pursue a civil action to collect an arbitration award from a former attorney prior to filing a complaint with the Director.

## II.

We turn next to Montgomery's contention that the referee erred in concluding that her conduct violated Minn. R. Prof. Conduct 1.15. The referee's determination that Montgomery's conduct violated Minn. R. Prof. Conduct 1.15 is within the scope of Rule 14(e), RLPR, and because no transcript was ordered, is conclusive for purposes of this proceeding. We therefore reject Montgomery's argument that the referee erred in finding a violation of Minn. R. Prof. Conduct 1.15.

## III.

■ Next we consider the Director's contention that the referee erred in failing to find certain aggravating factors in Montgomery's case. Specifically, the Director argues that Montgomery's prior disciplinary history, the intentional nature of her misrepresentations, her lack of remorse, her indifference to restitution, and the harm caused to the client by Montgomery's misconduct all constitute aggravating factors. In determining whether an attorney's professional misconduct either has been aggravated or mitigated, a referee both finds facts and draws conclusions from those facts. As we have explained, in the absence of a transcript we cannot review the referee's findings of fact or the conclusions drawn from those facts. Therefore, in the absence of a transcript we will not review a referee's lack of findings as to aggravating or mitigating circumstances. Because neither party ordered a transcript in this case, we decline to consider whether there were aggravating or mitigating factors here.

## IV.

■ Finally, we consider the appropriate discipline for Montgomery. The referee recommends that Montgomery be indefinitely suspended from the practice of law, with no right to petition for reinstatement for a minimum of 2 years. The Director urges us to adopt the referee's recommendation. Montgomery responds that a 2–year suspension is inappropriate because

the Director failed to prove that she had "converted the payment from BFAS to personal use" or that she acted in bad faith in failing to cooperate with the investigation. Montgomery urges us to do no more than order her to make arrangements for prompt payment of the arbitration award to BFAS, and to place her on "stipulated probation" if she fails to comply.

▓▓ Discipline for professional misconduct "is not to punish the attorney but rather to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *In re Rebeau*, 787 N.W.2d 168, 173 (Minn.2010). In determining the appropriate discipline, we consider four factors: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession. *In re Fett*, 790 N.W.2d 840, 850 (Minn.2010). Although "prior decisions guide and aid us in enforcing consistent discipline," *Rebeau*, 787 N.W.2d at 174, we ultimately determine sanctions "on a case-by-case basis after examining" the unique facts and circumstances of each case. *In re Mayrand*, 723 N.W.2d 261, 268 (Minn.2006). We give "great weight" to the referee's recommendation for discipline, but the "ultimate responsibility for sanctioning an attorney rests solely with this court." *In re Pinotti*, 585 N.W.2d 55, 62 (Minn.1998).

*Nature of the misconduct.*

▓▓ Failure to maintain and properly use a trust account is a serious violation of the Rules of Professional Conduct and often results in lengthy suspension or disbarment. *See In re Overboe*, 745 N.W.2d 852, 868 (Minn.2008); *In re Lochow*, 469 N.W.2d 91, 98 (Minn.1991) (stating that trust account violations "almost invariably result in lengthy suspension at the very

least")... We have "emphasized that '[t]he maintenance of proper trust account records is vital to the practice of the legal profession, since it serves to protect the client and avoid even the appearance of professional impropriety.'" *In re Klein*, 609 N.W.2d 230, 233 (Minn.2000) (quoting *In re Beal*, 374 N.W.2d 715, 716 (Minn. 1985)). Trust account violations need not be willful, and we "will not hesitate to impose a disciplinary suspension to protect the public from attorneys who either intentionally or unintentionally fail to exercise care in handling client funds." *In re Hoedeman*, 620 N.W.2d 714, 718 (Minn.2001) (quoting *In re Haugen*, 543 N.W.2d 372, 375 (Minn.1994)); *see also In re Ganley*, 549 N.W.2d 368, 370–71 (Minn.1996) (explaining that lawyers are "charged with the knowledge that [they] must maintain a separate account and adequate records," and imposing discipline even where an attorney's trust account violations were not undertaken with intent to defraud the client) (quoting *In re Shaw*, 298 N.W.2d 133, 135 (Minn.1980)).

▓▓ Montgomery's dishonesty in making false statements to BFAS, to successor counsel, to the arbitration panel, to the Director, to the referee, and to our court, and her submission of a falsified document to the arbitration panel and to the referee also constitutes serious misconduct. *See In re Dedefo*, 752 N.W.2d 523, 532 (Minn. 2008) (explaining that we "take dishonesty by lawyers seriously and have repeatedly held that a lack of truthfulness or candor warrants severe discipline"). Because "[h]onesty and integrity are chief among the virtues the public has a right to expect of lawyers," where an attorney breaches trust by making false statements it is "misconduct of the highest order and warrants severe discipline." *In re Ruffenach*, 486 N.W.2d 387, 391 (Minn.1992); *see also In re Margolis*, 570 N.W.2d 688, 692

(Minn.1997) (imposing a 1–year suspension where, among other things, the attorney attempted to conceal his misconduct by lying to a workers' compensation judge, opposing counsel, and the investigator, creating "a false memo to the file in a deliberate effort to thwart the disciplinary investigation," and "compound[ing] his wrongdoing by lying during a deposition").

 Finally, Montgomery failed to cooperate with the Director's investigation. We have stated "that if we are to meet our goal of protecting the public we cannot ignore conduct where a lawyer acts 'with complete disregard for the disciplinary process.'" *In re Ek,* 643 N.W.2d 611, 614 (Minn.2002) (quoting *In re Sigler,* 512 N.W.2d 899, 901–02 (Minn.1994)). Failure to cooperate "with the disciplinary process constitutes separate misconduct warranting discipline independent from the conduct underlying the petition." *In re Brooks,* 696 N.W.2d 84, 88 (Minn.2005). Noncooperation, by itself, supports a sanction of indefinite suspension, *In re Samborski,* 644 N.W.2d 402, 407 (Minn.2002), and we typically "increase[ ] the severity of the disciplinary sanction" where noncooperation exists. *In re Nelson,* 733 N.W.2d 458, 464 (Minn.2007).

*Cumulative weight of the misconduct.*

 We look at the conduct giving rise to discipline as a whole, and have recognized that "the cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." *In re Oberhauser,* 679 N.W.2d 153, 160 (Minn.2004); *see also In re Grathwol,* 574 N.W.2d 70, 70 (Minn.1998) (ordering a 12–month suspension when the attorney failed to communicate with a client or return unearned fees and did not cooperate with the Director); *In re Field,* 506 N.W.2d

631, 631 (Minn.1993) (suspending an attorney for 1 year for multiple trust account violations). For example, we distinguish "a brief lapse in judgment or a single, isolated incident of misappropriation from multiple instances of misappropriation occurring over a substantial amount of time or involving significant amounts of money." *In re Fairbairn,* 802 N.W.2d 734, 743 (Minn.2011) (citations omitted) (internal quotations omitted).

Although Montgomery's misconduct arose out of a single representation and occurred over a relatively short period of time, during that relatively short period of time she committed multiple, serious types of misconduct. We are particularly troubled by Montgomery's repeated false statements and her continued pattern of misrepresentations: first to her client, BFAS, then to successor counsel, the arbitration panel, the Director, the referee, and finally to our court. The cumulative weight of Montgomery's violations and her elaborate efforts to conceal her misconduct support a significant sanction.

*Harm to the public and to the legal profession.*

 The referee found, and Montgomery admitted during oral argument before us, that she still has not made any payment on the $3,250 arbitration award entered in December 2009. The extent of harm to clients is a factor we consider in determining the appropriate discipline. *Cf. Fairbairn,* 802 N.W.2d at 743 (taking into consideration the fact that Fairbairn's clients did not suffer any direct financial harm due to misappropriated funds in ordering less severe discipline). Misuse of a client's funds "is a breach of trust that reflects poorly on the entire legal profession and erodes the public's confidence in lawyers." *In re Rooney,* 709 N.W.2d 263, 270 (Minn.2006).

Here, Montgomery's misconduct caused substantial financial injury to BFAS. For 2 years Montgomery has failed to remit the unearned legal fees paid by BFAS and to satisfy the award of a fee arbitration she agreed would be binding. Moreover, Montgomery's dishonesty throughout these proceedings has harmed public confidence in the legal system generally.

Based on our analysis, we conclude that a 2–year suspension adequately reflects the seriousness of Montgomery's misconduct, and conveys to attorneys and the public that trust account violations and dishonesty by attorneys will not be tolerated. Accordingly, we order that:

1. Respondent Angela Montgomery Montez, now known as Angela Montgomery, be indefinitely suspended from the practice of law, effective 14 days from the filing of this order, and that she be ineligible to petition for reinstatement for a minimum of 2 years from the effective date of suspension. Montgomery shall comply with Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals). Should Montgomery seek to be reinstated to the practice of law in Minnesota, she shall comply with Rule 18(a)-(e), RLPR.

2. Upon reinstatement, Montgomery shall be subject to supervised probation for a period of 2 years under such terms as the court may then impose.

3. Montgomery is permanently barred from maintaining, or from being an authorized signer on, a client trust account.

4. As a condition of petitioning for reinstatement, Montgomery must provide proof that she has satisfactorily completed the professional responsibility portion of the state bar examination.

5. As a condition of petitioning for reinstatement, Montgomery must demonstrate that she has paid the December 4, 2009, binding fee arbitration award of $3,250 in full.

6. Montgomery shall pay the Director's office $900 in costs and an amount in disbursements to be determined in compliance with Rule 24, RLPR.

So ordered.