STATE OF MINNESOTA

IN SUPREME COURT

A24-1439

Original Jurisdiction

Per Curiam
Concurring, Thissen, J.

In re Petition for Disciplinary Action
against, Bradley J. Haddy, a Minnesota
Attorney, Registration No. 0387503.

Filed: April 29, 2026
Office of Appellate Courts

————————————————

Susan M. Humiston, Director, Timothy M. Burke, Senior Assistant Director, Office of
Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Bradley J. Haddy, Mendota Heights, Minnesota, pro se.

————————————————

S Y L L A B U S

1.      The referee's findings and conclusions that the attorney committed

disciplinary violations were not clearly erroneous.

2.      Disbarment is the appropriate discipline for an attorney who

misappropriated client funds, engaged in a pattern of client neglect, and initially failed to

cooperate with the disciplinary investigations.

Disbarred.

O P I N I O N

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition

for disciplinary action against respondent Bradley J. Haddy, alleging several acts of

1

professional misconduct, including misappropriation of client funds, failure to communicate with clients, failure to abide by client decisions, and failure to cooperate with the Director's investigation. We appointed a referee. Following an evidentiary hearing, the referee determined that Haddy's conduct violated multiple rules of professional conduct and recommended disbarment. Haddy challenges some of the referee's findings and conclusions, and he argues that he should be suspended, rather than disbarred. The Director supports the referee's recommended discipline. We conclude that the referee's findings and conclusions are not clearly erroneous and that the appropriate discipline is disbarment.

## FACTS

Haddy was admitted to practice law in Minnesota in 2007. He has primarily focused on family and criminal law. Haddy was disciplined on one prior occasion. In 2019, he received a private admonition for failing to promptly return client property and for knowingly and willfully disobeying two court orders to do so.

The Director filed a petition for disciplinary action against Haddy in September 2024, alleging numerous violations of the Minnesota Rules of Professional Conduct stemming from Haddy's representation in three client matters. In November 2024, the Director filed a supplemental petition alleging that Haddy committed additional misconduct in two other client matters. Haddy requested an evidentiary hearing, which was held before a referee in January 2025.

Following the evidentiary hearing, the referee issued findings of fact and conclusions of law in February 2025. One week later, the referee issued an amended

2

order. The referee determined that Haddy committed multiple acts of misconduct, spanning five client matters and violating multiple rules of conduct. We briefly summarize the referee's findings and conclusions.

### M.M. Matter

Haddy represented M.M. in divorce proceedings. During the proceedings, M.M. and his spouse sold a townhouse. Pursuant to an agreement between M.M. and the spouse, a portion of the sale proceeds were deposited into Haddy's trust account pending further agreement or a court-ordered distribution.

On multiple occasions, Haddy transferred funds from the trust account to his law firm's operating account. The transfers led to trust account shortages during which the account contained less than the sale proceeds Haddy had agreed to hold in trust. M.M. was not informed of the shortages. Haddy ultimately replenished the funds in the trust account and distributed them in full when M.M. discharged Haddy and retained new representation. Haddy testified at his evidentiary hearing that he intentionally transferred the money out of his trust account, that he lacked authorization to do so, and that he used the funds to pay business expenses.

The referee determined that Haddy intentionally misappropriated M.M.'s funds in violation of Minnesota Rules of Professional Conduct 1.15(a)[1] and 8.4(c).[2]

---

[1]     Rule 1.15(a) states, "All funds of clients or third persons held by a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts."

[2]     Rule 8.4(c) states, "It is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

*M.B. Matter*

In December 2022, M.B. retained Haddy to represent him in a criminal case. During their initial meeting, M.B. informed Haddy that he was scheduled to appear in court in January 2023. M.B. paid Haddy $1,750, but Haddy and M.B. did not enter into a written fee agreement. Haddy deposited the funds into his operating account.

Following their initial meeting, Haddy did not file a certificate of representation with the court and, consequently, did not receive notifications from the district court regarding M.B.'s case. Haddy failed to appear at M.B.'s January 2023 hearing. The district court granted M.B. a continuance and rescheduled the hearing to March. After the January hearing, M.B. called Haddy's office and spoke with Haddy's assistant, notifying the assistant that the hearing had been rescheduled to March. M.B. attempted to contact Haddy several times ahead of the March hearing, but Haddy did not return his calls. Haddy did not appear at M.B.'s March hearing, and the district court assigned M.B. a public defender. At the evidentiary hearing before the referee, Haddy testified that he lost track of M.B.'s case.

The referee determined that Haddy violated Minnesota Rules of Professional Conduct 1.3,[3] 3.2,[4] and 8.4(d)[5] by failing to appear at M.B.'s hearings; 1.4(a)(4)[6] by failing to respond to M.B.'s requests for communication; 1.15(a) and 8.4(c) by depositing M.B.'s funds into his operating account without a written agreement; 1.15(c)(5) by depositing M.B.'s funds into his business account rather than his trust account; and 1.16(d)[7] by failing to return M.B.'s funds.

### R.B.M. Matter

R.B.M. retained Haddy to represent him in a harassment restraining order case. A trial commenced in July 2022 but was continued. In August 2022, the district court ordered the trial to resume in December 2022. The day before trial, Haddy informed the district court that he had a scheduling conflict and requested a continuance. The district court granted the request and rescheduled trial for the following week. When Haddy requested a second continuance, the district court declined to further delay the trial.

---

[3] Rule 1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client."

[4] Rule 3.2 states, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

[5] Rule 8.4(d) states, "It is professional misconduct for a lawyer to … engage in conduct that is prejudicial to the administration of justice."

[6] Rule 1.4(a)(4) states, "A lawyer shall … promptly comply with reasonable requests for information."

[7] Rule 1.16(d) states, "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as … refunding any advance payment of fees or expenses that has not been earned or incurred."

Haddy informed R.B.M. that he would not attend the first day of trial and suggested that R.B.M. appear alone and request a continuance. Haddy did not inform the district court or opposing counsel that he would not appear and, ultimately, neither Haddy nor R.B.M. appeared. The district court held and completed the trial in their absence.

The referee determined that Haddy's failure to appear violated Minnesota Rules of Professional Conduct 1.3, 3.2, and 8.4(d).

### S.Z. Matter

S.Z. retained Haddy to represent him in an ongoing child custody matter. In February 2024, the district court awarded S.Z. temporary sole legal and sole physical custody of the child and appointed a guardian ad litem (GAL). At the time, the child was enrolled in a school that was approximately 40 miles from S.Z.'s home. S.Z. wanted to enroll the child in a school closer to his home, but the custody order prohibited that change. S.Z. asked Haddy in February 2024 to file a motion requesting authorization to enroll the child in the preferred school, but Haddy advised against filing the motion unless S.Z. obtained the support of the GAL for the change. S.Z. asked Haddy to file the motion several times between February and August 2024, and Haddy declined. In August, as the beginning of a new school year approached, S.Z. again asked Haddy to file the motion, and Haddy again responded that S.Z. should seek the GAL's approval. S.Z. urged Haddy to address the matter of the child's school "whether the GAL has input or not." He directed Haddy to "[p]lease have a motion written up, so I can get my son enrolled into school. Right now that is my top priority."

When Haddy did not file the motion, S.Z. filed an ethics complaint. Two days after learning of the ethics complaint, Haddy filed the motion without formal input from the GAL and the district court granted it.

The referee concluded that Haddy's failure to file the motion, despite multiple requests to do so, constituted a failure to abide by his client's decisions regarding representation objectives in violation of Minnesota Rule of Professional Conduct 1.2(a).[8] However, the referee concluded that Haddy did not violate Minnesota Rules of Professional Conduct 1.3[9] or 1.4(a)(4)[10] because his explanation for the delay "was not an unreasonable position," and Haddy explained that position to S.Z. and remained accessible to S.Z.

### R.R. Matter

Haddy represented R.R. in several matters, including a post-dissolution child custody proceeding. In the dissolution judgment and decree, the district court granted R.R. and the child's mother joint legal and physical custody of the child. The parenting time agreement provided that R.R., who lived in Mexico, would have custody of the child during the child's summer academic break.

---

[8]    Rule 1.2(a) states, "[A] lawyer shall abide by a client's decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued."

[9]    Rule 1.3 requires a lawyer to act with "reasonable diligence and promptness in representing a client."

[10]    Rule 1.4(a)(4) requires a lawyer to "promptly comply with reasonable requests for information."

In the summer of 2024, R.R. alleged that the mother would not permit the child to travel to Mexico and moved to enforce the parenting time agreement. The district court granted partial temporary relief, ordering the mother to facilitate the child's travel to Mexico and setting another hearing for October. In September, Haddy was served with a motion indicating that the mother intended to seek modification of the custody and parenting time agreement at the October hearing.

Haddy did not notify R.R. of the pending motion, did not provide copies of the motion papers to R.R., did not inform R.R. of the October hearing, and did not respond to the motion. When Haddy did not respond to the motion and neither Haddy nor R.R. appeared at the October hearing, the district court deemed the mother's motion unopposed and awarded her temporary sole legal and physical custody of the child. R.R. testified that he incurred approximately $5,000 in legal fees when he obtained new representation and moved to vacate the custody order.

The referee concluded that Haddy's failure to inform R.R. of the motion, failure to notify R.R. of the hearing, and failure to provide the motion papers to R.R. violated Minnesota Rules of Professional Conduct 1.4(a)(3)[11] and (b).[12] The referee also concluded that Haddy's failure to respond to the motion and failure to appear violated Minnesota Rule of Professional Conduct 1.3.

---

[11]     Rule 1.4(a)(3) states, "A lawyer shall … keep the client reasonably informed about the status of the matter."

[12]     Rule 1.4(b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

### *The Director's Investigation*

Between May and July 2024, the Director notified Haddy of the investigation into M.B.'s complaint and that he was charged with unprofessional conduct. The Director's notices required a response and included requests for documents and information. Haddy failed to timely respond to the requests or answer the charges. The referee found that Haddy's failure to cooperate with the Director's investigations in a timely manner violated Minnesota Rule of Professional Conduct 8.1(b)[13] and Rule 25, Minnesota Rules on Lawyers Professional Responsibility (RLPR).[14]

The referee concluded that Haddy committed substantial misconduct that harmed multiple clients and undermined public trust in the legal profession. Additionally, the referee found the presence of three aggravating factors: Haddy's failure to express remorse, Haddy's substantial legal experience, and Haddy's prior discipline. The referee found no mitigating circumstances, but credited Haddy for conceding most of the facts underlying the misconduct allegations and restoring M.M.'s funds. Based on these findings and conclusions, the referee recommended that Haddy be disbarred.

---

[13]     Rule 8.1(b) states, "[A] lawyer … in connection with a disciplinary matter, shall not … knowingly fail to respond to a lawful demand for information from … [a] disciplinary authority."

[14]     Rule 25(a) of the Rules on Lawyers Professional Responsibility provides that "[i]t shall be the duty of any lawyer who is the subject of an investigation or proceeding under these Rules to cooperate with … the Director."

**ANALYSIS**

Before this court, Haddy challenges the referee's findings and conclusions regarding his misconduct in three of the five client matters. He also challenges the referee's recommendation for discipline—arguing that the referee erred in finding that he lacked remorse for his misconduct—and seeks a suspension, rather than disbarment. We first consider Haddy's challenges to the referee's findings and conclusions in the three client matters. Then, we address the appropriate discipline for Haddy's misconduct.

I.

Although Haddy's briefing touches on all the misconduct that the referee found, Haddy only disputes the referee's findings and conclusions as to three matters—the M.B. matter, the S.Z. matter, and the R.R. matter. We consider Haddy's arguments concerning each of these three matters. We do not otherwise address the referee's findings and conclusions as to Haddy's misconduct in the M.M. and R.B.M. matters, which Haddy does not challenge.

When a party to a disciplinary proceeding orders a transcript of the evidentiary hearing—as Haddy did here—the referee's findings of fact and conclusions are not binding. Rule 14(e), RLPR. But we afford the referee's findings and conclusions "great deference," and will uphold the findings "if they have evidentiary support and are not clearly erroneous."[15] *In re Kaminsky*, 999 N.W.2d 866, 873 (Minn. 2024). "Factual

---

[15]    Haddy contends that we must review his claims under the abuse of discretion standard because the referee in his case relied on exhibits, testimony, and arguments, and his conclusions were therefore evidentiary rulings. *See In re Walsh*, 872 N.W.2d 741, 745 (Minn. 2015) (stating that a referee's authority to make evidentiary rulings is reviewed

findings are clearly erroneous if, after viewing the record, this court is left with the definite and firm conviction that a mistake has been made." *Id.* (citation omitted) (internal quotation marks omitted). "A referee's conclusion of law that a rule of professional conduct has been violated is also reviewed for clear error, but the referee's interpretation of the rules is reviewed de novo." *Id.*

## A.

Haddy challenges the referee's findings and conclusions regarding the M.B. matter. The referee found that M.B. retained Haddy to represent him in a criminal case, M.B. paid Haddy $1,750 for the representation, Haddy accepted a retainer fee but did not enter into a written representation agreement, Haddy failed to deposit the funds into his trust account, Haddy twice failed to appear in court on behalf of M.B., and Haddy failed to refund the legal fees that M.B. paid. Based on these findings, the referee concluded that Haddy violated Minnesota Rules of Professional Conduct 1.15(a), 1.15(c)(5), 1.16(d), 1.3, 1.(4)(a)(4), 3.2, 8.4(c), and 8.4(d).

In his briefing to this court, Haddy attempts to relitigate some of the facts underlying the M.B. matter. He explains that M.B.'s case "fell through the cracks." He asserts that "[i]t was disingenuous of [M.B.] to suggest he believed [Haddy] was retained on an hourly basis." He accuses M.B. of committing perjury at the evidentiary hearing before the referee. He faults the referee for not recognizing his remorse for losing track of

_____

for abuse of discretion). But Haddy does not challenge the admission of any evidence. Rather, his challenges concern the referee's factual findings and conclusions. As noted, we uphold those findings "if they have evidentiary support and are not clearly erroneous." *Kaminsky*, 999 N.W.2d at 873.

11

M.B.'s case. He asserts that he had "no intentional malice." He points out that he told M.B. "that he was happy that [M.B.] was assigned a public defender and that [M.B.] was treated fairly." And, in his reply brief, Haddy argues that his attempts to refund M.B. are "mitigating."

We construe Haddy's assertions on appeal as challenges to the referee's factual findings and conclusions regarding the M.B. matter. As noted, we review those factual findings and conclusions for clear error. *Kaminsky*, 999 N.W.2d at 873.

Initially, we observe that the referee stated that Haddy "essentially admit[ted] all of the allegations related to [M.B.'s] case." Our review of the record confirms this finding. Although Haddy explained to the referee that the misconduct occurred because Haddy "lost track" of M.B.'s case, Haddy did not deny that he agreed to represent M.B., accepted M.B.'s money, did not enter into a retainer agreement or deposit the funds in a trust account, and failed to appear at M.B.'s hearings. Haddy also did not deny that, at the time of the hearing, he had not yet refunded M.B.'s money.[16] Thus, the referee's findings underlying the conclusion that Haddy committed misconduct in violation of the Minnesota Rules of Professional Conduct are consistent with Haddy's own testimony at the hearing and are not clearly erroneous.[17]

---

[16]    Haddy asserts, and the Director does not dispute, that Haddy refunded the fee to M.B. following the evidentiary hearing before the referee.

[17]    The concurrence contends that the referee clearly erred in finding that Haddy's failure to refund M.B.'s payment violated Rule 1.16(d) of the Minnesota Rules of Professional Conduct. As noted, that rule states, "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as … refunding any advance payment of fees or expenses that has not been earned

12

Haddy also challenges as "disingenuous" M.B.'s testimony at the evidentiary hearing that he believed he had hired Haddy on an hourly basis. According to Haddy's brief, M.B. hired Haddy "because [Haddy's] flat fee was within an amount he could afford." But the referee's findings acknowledged that M.B. "was uncertain if the fee was a flat fee or a retainer for services to be rendered." The referee also credited Haddy's testimony that "he only represented clients under a flat fee arrangement."

More importantly, because Haddy and M.B. did not enter into a written fee agreement and Haddy deposited the funds into his operating account rather than his trust

---

or incurred." According to the concurrence, the record does not support the referee's finding—implicit in its determination that Haddy violated Rule 1.16(d)—that it was "reasonably practicable" for Haddy to refund M.B.'s fee. The concurrence points out that M.B. acknowledged that the email address he provided Haddy was "fake." Additionally, the concurrence emphasizes that the referee also found that the evidence did not establish that Haddy received a refund request from M.B.'s subsequent attorney.

For a few reasons, we respectfully disagree with our concurring colleague on this point. First, we discern no conflict between the referee's finding that the evidence did not establish that Haddy received a *request* for a refund and the finding that Haddy failed to "take steps to the extent reasonably practicable" to refund the fee. Under Rule 1.16(d), a lawyer is obligated to try to refund a client's fee upon the termination of representation, even absent a request. Second, the referee's underlying factual findings, which are founded in the record, support the referee's finding that Haddy violated Rule 1.16(d) by failing to take steps to the extent reasonably practicable to refund M.B.'s fee. The referee found that M.B. called and attempted to contact Haddy multiple times following Haddy's failure to appear at M.B.'s first hearing in January 2023. During one call, the referee found, M.B. spoke with Haddy's assistant. The referee also found that Haddy never returned M.B.'s calls or contacts during that timeframe and that Haddy again failed to appear on behalf of M.B. in March 2023. Only following the commencement of the disciplinary proceeding in December 2024 did Haddy and his assistant attempt to email M.B. about a refund. And at the time of the evidentiary hearing in January 2025, Haddy had yet to refund M.B.'s fee. Given the referee's underlying factual findings, which the record supports, the referee did not clearly err in finding that Haddy violated Rule 1.16(d) by failing to take steps to the extent reasonably practicable to refund M.B.'s fee.

13

account—facts that were undisputed at the evidentiary hearing—it is immaterial whether M.B.'s funds constituted an hourly fee or flat fee. Minnesota Rule of Professional Conduct 1.5(b)(1), provides, "If agreed to in advance in a written fee agreement signed by the client, a flat fee shall be considered to be the lawyer's property upon payment of the fee." However, without a written fee agreement, "[a] lawyer shall … deposit all fees received in advance of the legal services being performed into a trust account and withdraw the fees as earned." Minn. R. Prof. Conduct 1.15(c)(5). Absent a written fee agreement, Haddy was required to deposit M.B.'s fee into his trust account. *Id*. Haddy admitted that the fee was not deposited into his trust account but instead was deposited into his operating account. Thus, regardless of whether the fee was for hourly work or was a flat rate, the referee did not clearly err in finding that Haddy violated Rule 1.15(c)(5) by depositing the funds into his operating account.

Finally, Haddy suggests that the referee clearly erred by failing to recognize Haddy's remorse regarding the M.B. matter and the lack of enduring harm to M.B. The referee's findings of fact do acknowledge Haddy's limited expressions of contrition. Haddy explained during his testimony before the referee why he had not yet refunded M.B.'s fee, and he expressed his willingness to provide a refund; the referee credited these portions of Haddy's testimony. But the referee also observed that Haddy testified that he did not believe his misconduct caused lasting harm to any of his clients. And the referee contrasted this claim with M.B.'s testimony that M.B. had still not received a refund from Haddy. Furthermore, the referee found that Haddy's multiple failures in

14

representing M.B. caused M.B. frustration and "even fear as to how his criminal case might proceed without an attorney."

The referee's decision to give more weight to M.B.'s testimony than Haddy's testimony was based on the referee's credibility determinations. We must defer to a referee's credibility determinations. *In re Kennedy*, 946 N.W.2d 568, 578 (Minn. 2020). Moreover, the testimony in the record supports the referee's factual findings regarding Haddy's lack of remorse and the harm to M.B. Thus, we conclude that these findings are not clearly erroneous.

Because the record—and Haddy's own testimony—supports the referee's findings, those findings are not clearly erroneous.

B.

We next address the referee's findings and conclusions as to the S.Z. matter. The referee found that S.Z.'s home, where the child resided, was 40 miles away from the child's school. S.Z. asked Haddy multiple times to file a motion for permission to change the child's school. Haddy recommended that S.Z. work directly with the GAL to obtain a statement supporting the school change and did not file a motion, despite S.Z.'s continuing requests. In early August 2024, as the upcoming school year approached, S.Z. again asked Haddy to file a motion requesting the change. According to the referee's findings, Haddy responded:

> Let me state it again—what is the GAL going to say or do? You have had some contact with her. She has the duty of protecting (that is her role) [your son]. She should state that it is in his best interest to change. Also, we need a statement from the mom stating why it is important to [your son].

S.Z. then replied: "Every time you say you are going to call me, you don't. Every time you say you are going to send me something, you don't." S.Z. also stated, "When you … say that you would be sending me something within the day and then nothing, and then I don't even hear from you for weeks." S.Z. asked Haddy to "have a motion written up so I can get my child enrolled into school," and he told Haddy that this was his "top priority." Haddy still did not file a motion. S.Z. then filed an ethics complaint. Two days after the Director emailed Haddy the notice of the investigation of S.Z.'s complaint, Haddy filed an emergency motion in the district court, which was granted.

The referee found that Haddy's delay violated Rule 1.2(a) of the Minnesota Rules of Professional Conduct. Rule 1.2(a) provides, "[A] lawyer shall abide by a client's decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued." Although the referee found that Haddy remained in contact with S.Z., explained his reasoning to S.Z., and advised S.Z. on the next steps, the referee also found that Haddy's "delay in filing the motion did come perilously close to risking that the child would not be able to change school districts at the start of the new year." The referee also characterized Haddy's delay in filing the motion as "problematic."

Before this court, Haddy does not directly challenge any of the referee's findings or conclusions. Instead, Haddy seems to argue that his misconduct in representing S.Z. was less serious. He observes that he provided "exceptional representation" to S.Z., "albeit … delayed." Haddy notes that S.Z. "did not suffer," S.Z's child was not harmed, and S.Z. acknowledged at the evidentiary hearing that he "now understands the strategy

16

that [Haddy] recommended." Haddy points out that he continued to represent S.Z. in the family law matter even after S.Z. filed the ethics complaint. Finally, Haddy states that he "is remorseful because his actions caused [S.Z.] to feel ignored."

Haddy's assertions are consistent with the referee's findings and conclusions. We determine that those findings and conclusions, which are supported by the record, are not clearly erroneous. *See Kaminsky*, 999 N.W.2d at 873.

As to any argument that Haddy's misconduct in representing S.Z. was less serious and therefore should not be sanctioned, the referee acknowledged as much. The referee rejected the Director's arguments that Haddy violated additional rules in representing S.Z., concluding that Haddy's communications, although delayed, did not violate rules requiring diligence and promptness. Further, beyond including the S.Z. matter among the multiple matters that formed a pattern of client neglect, the referee did not place particular weight on the S.Z. matter in deciding the appropriate discipline to impose.

C.

Finally, Haddy argues that the referee erred in finding that R.R. was required to hire a new attorney, at great expense, after Haddy failed to inform R.R. that his former spouse had moved to modify custody and parenting time and failed to respond to the motion on R.R.'s behalf. He also contends that the referee erred in finding that R.R. lost custody of his child following Haddy's misconduct.

The record supports the referee's findings. R.R. testified that he hired another attorney to challenge the district court's custody order and that he paid $5,000 in fees to the new attorney. Further, because Haddy did not respond to the custody motion or appear

in court, the district court determined that it was unopposed. The district court then granted the motion, giving R.R.'s former spouse temporary sole legal and sole physical custody of the child. According to R.R., his new attorney moved to vacate that custody order based on Haddy's misconduct. At the time of the evidentiary hearing, the new attorney's motion was pending.

Because the record supports the referee's findings, they are not clearly erroneous. *See Kaminsky*, 999 N.W.2d at 873. Thus, we reject Haddy's arguments concerning the R.R. matter.

## II.

Having resolved Haddy's challenges to the referee's findings and conclusions, we next determine the appropriate discipline for Haddy's misconduct. The referee recommended that Haddy be disbarred, and the Director asks us to adopt that recommendation. Haddy argues that his misconduct does not warrant disbarment because he contends that the harm he caused was minimal and his lack of intent to permanently deprive clients of their funds mitigates his misconduct.

The purpose of discipline for attorney misconduct is not punishment. *In re Bonner*, 896 N.W.2d 98, 107 (Minn. 2017). Rather, it is "to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *Id*. at 107.

We give "great weight" to a referee's discipline recommendation but "retain ultimate responsibility for determining appropriate discipline." *In re Montez*, 812 N.W.2d 58, 66, 68 (Minn. 2012). To determine the appropriate discipline, we consider four

18

factors: "(1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." *In re Odegaard*, 15 N.W.3d 632, 634 (Minn. 2025). In addition to these factors, we consider whether any circumstances aggravate or mitigate the misconduct, and we look to similar cases to ensure that we impose consistent discipline. *Id.*

## A.

We first consider the four factors bearing on the discipline to be imposed, addressing each factor in turn.

## 1.

The first factor is the nature of Haddy's misconduct. Haddy's most serious misconduct was the misappropriation of M.M.'s and M.B.'s funds. Misappropriation is "particularly serious misconduct and usually warrants disbarment absent clear and convincing evidence of substantial mitigating factors." *In re Hulstrand*, 910 N.W.2d 436, 442 (Minn. 2018). Intentional misappropriation occurs "when an attorney uses client funds for his or her own personal benefit, even when the attorney did not intend to permanently deprive a client of his or her funds." *In re Klotz*, 909 N.W.2d 327, 336–37 (Minn. 2018); *see In re Fairbairn*, 802 N.W.2d 734, 743 (Minn. 2011) ("Borrowing from client funds, no matter how temporary or no matter how seemingly safe, is misappropriation and is not to be countenanced." (citation omitted) (internal quotation marks omitted)). An attorney also misappropriates client funds by accepting a fee but performing no legal work for the client and failing to refund the fee. *See In re Lundeen*, 811 N.W.2d 602, 608 (Minn. 2012).

There is no dispute that Haddy intentionally misappropriated M.M.'s funds. Haddy testified that he purposefully transferred M.M.'s funds from his trust account to his operating account and used the funds to pay his business expenses. Although the referee found that Haddy did not intend to retain the funds and that Haddy eventually returned them in full, Haddy's conduct constitutes intentional misappropriation under our case law. *See Klotz*, 909 N.W.2d at 336–37.

Haddy also misappropriated M.B.'s funds. As discussed, Haddy does not dispute that he accepted M.B.'s funds, that he did not enter into a retainer agreement or deposit the funds into a trust account, and that he did no legal work on M.B.'s behalf. Although Haddy contends that he attempted to refund M.B.'s fee before the evidentiary hearing, he did not do so. We agree that Haddy misappropriated M.B.'s funds by accepting M.B.'s fee, failing to enter into a retainer agreement or deposit the funds in a trust account, failing to perform any legal work on M.B.'s behalf, and failing to refund the fee. *See In re Taplin*, 837 N.W.2d 306, 311 (Minn. 2013) (stating that an attorney misappropriates client funds by performing no legal work after receiving a fee and failing to issue a refund).[18]

---

[18] Our case law has not always been clear about the distinction between "intentional" and "negligent" misappropriation of client funds. The referee did not make a finding as to whether Haddy's misappropriation of M.B.'s funds was intentional or negligent, and Haddy does not raise any argument to this court regarding this distinction. Accordingly, we need not and do not decide whether the misappropriation was intentional, negligent, or accompanied by some other state of mind.

The referee found that Haddy's conduct involving M.B.'s fee violated Rule 8.4(c) of the Minnesota Rules of Professional Conduct. Under that rule, "It is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The referee found that Haddy violated this rule by "accepting a retainer fee without written agreement of representation," by "failing to deposit the funds in his trust account" in violation of Rule 1.15(a), and by "using the funds for business

In addition to engaging in misappropriation, Haddy neglected clients in the M.B., R.B.M., and R.R. matters. We have said that a pattern of client neglect and the failure to communicate in multiple client matters is serious misconduct. *See In re Lennington*, 969 N.W.2d 76, 83 (Minn. 2022). Client neglect includes, among other things, failing to file briefs or motions, failing to communicate with clients or inform them of proceedings, failing to act with reasonable diligence and promptness, and failing to appear in court. *See In re Grzybek*, 567 N.W.2d 259, 263 (Minn. 1997) (neglecting to file briefs); *In re Davis*, 542 N.W.2d 378, 378 (Minn. 1996) (order) (failing to communicate); *In re Matson*, 889 N.W.2d 17, 21–22 (Minn. 2017) (failing to keep client apprised of case status or provide client with important case-related documents); *Taplin*, 837 N.W.2d at 312 (failing to attend hearings). "We have repeatedly warned that a continuing pattern of client neglect is serious misconduct often warranting indefinite suspension by itself and that more extreme cases involving client neglect and failure to communicate with clients may merit disbarment." *In re Sayaovong*, 909 N.W.2d 575, 582 (Minn. 2018) (quoting *In re Rhodes*, 740 N.W.2d 574, 578 (Minn. 2007)).

---

and/or personal expenses." The concurrence asserts that the record does not support the referee's findings that Haddy used the funds for business and/or personal expenses, and that Haddy engaged in "dishonesty, fraud, deceit, or misrepresentation." We respectfully disagree with both of these contentions. Because Haddy acknowledged that M.B.'s fee was deposited into Haddy's operating account in December 2022, and the fee had not been refunded to M.B. at the time of the evidentiary hearing in January 2025, it was reasonable for the referee to infer that Haddy used the funds for business and/or personal expenses. Moreover, because Haddy agreed to represent M.B., accepted M.B.'s fee, failed to deposit the fee into a trust account, did not enter into a written retainer agreement, performed no work for M.B., and did not refund M.B.'s fee, the referee did not clearly err in finding that Haddy engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c).

At the evidentiary hearing, Haddy did not dispute that in the M.B., R.B.M., and R.R. matters he failed to appear at hearings, failed to file motions, and failed to communicate with his clients. And because Haddy neglected multiple clients, multiple times, over a period of years, we conclude that this misconduct constitutes a pattern. *See In re Laver*, 984 N.W.2d 556, 566–67 (Minn. 2023) (multiple forms of misconduct involving multiple clients over a period of years constitutes a pattern of client neglect). Accordingly, Haddy's client neglect was serious misconduct. *Id.*

Finally, Haddy's failure to cooperate with the Director's investigation increased the severity of his misconduct. When coupled with other forms of misconduct, noncooperation "increase[s] the severity of the disciplinary sanction." *Id.* at 566. Haddy conceded that he failed to timely respond to the Director's inquiries. As the referee found, however, Haddy did eventually respond to the investigation. Accordingly, although Haddy committed serious misconduct by failing to timely respond to the investigation, his misconduct was less serious than an outright and prolonged refusal to cooperate. *See In re Moulton*, 945 N.W.2d 401, 409 (Minn. 2020) (noting that belated compliance is "less serious than a case where a lawyer altogether refuses to provide information to the Director").

In sum, Haddy engaged in serious misconduct by misappropriating client funds and engaging in a pattern of client neglect. His initial failure to cooperate with the Director's investigation increased the severity of the misconduct. This weighs in favor of serious discipline—disbarment or an indefinite suspension.

2.

The second factor we must consider in determining the appropriate discipline is the cumulative weight of Haddy's misconduct. In assessing cumulative weight, we consider "the conduct giving rise to discipline as a whole." *In re Eskola*, 891 N.W.2d 294, 299–300 (Minn. 2017). We recognize that "the cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." *Montez*, 812 N.W.2d at 69 (citation omitted) (internal quotation marks omitted). We therefore treat "[a] brief lapse in judgment or a single, isolated incident of misconduct [as] less serious than multiple instances of misconduct occurring over a substantial period of time." *In re Nickitas*, 984 N.W.2d 232, 239 (Minn. 2023); *see In re Albrecht*, 779 N.W.2d 530, 540–41 (Minn. 2010) (explaining that acts of client neglect, incompetent representation, improper advice, and conduct prejudicial to justice, considered alone, may not warrant severe punishment but the cumulative weight of the violations does).

Haddy's misconduct involved five clients and included numerous distinct violations over the course of approximately two years. Considered as a whole, Haddy's various acts are not brief lapses in judgment or isolated incidents. *Compare In re Nwaneri*, 978 N.W.2d 878, 891 (Minn. 2022) (stating that multiple acts of misconduct spanning six months was not a brief lapse of judgment), *with In re McCloud*, 955 N.W.2d 270, 279 (Minn. 2021) (concluding the cumulative weight of misconduct involving one client matter over the course of only two months does not weigh heavily against attorney); *see also Fairbairn*, 802 N.W.2d at 743 (concluding that eight acts of

23

misconduct in a period of thirteen months was not a brief lapse in judgment or single isolated incident).

Cumulatively, Haddy's misconduct weighs in favor of serious discipline. *See In re Ulanowski*, 800 N.W.2d 785, 801 (Minn. 2011) (concluding that multiple types of misconduct resulting in 12 rule violations over the course of three years warrants serious sanction); *In re Swanson*, 967 N.W.2d 644, 655 (Minn. 2021) (concluding that violating 14 rules within several years weighs in favor of more severe discipline).[19]

### 3.

Next, we consider the harm Haddy's misconduct caused to the public. In weighing public harm, we consider the number of clients impacted by an attorney's misconduct and the extent of their injuries. *In re Coleman*, 793 N.W.2d 296, 308 (Minn. 2011); *In re Udeani*, 945 N.W.2d 389, 397 (Minn. 2020) (stating that "[w]e measure harm to the public based on the quantity (the number of clients harmed) and the quality (the extent of the clients' injuries)"). Client injuries include both financial and emotional harm arising from an attorney's misconduct. *See In re Lee*, 3 N.W.3d 278, 284 (Minn. 2024).

Haddy's misconduct affected numerous clients and caused those clients substantial harm. His misconduct in R.R.'s case alone constitutes serious harm. Because Haddy failed to notify R.R. of a custody hearing and failed to appear at that hearing, the district

---

[19]     Because the same misconduct could violate multiple rules, we are mindful that multiple rule violations alone may not provide an accurate picture of the scope of an attorney's misconduct. This concern does not exist in Haddy's case, however, where there were multiple instances of misconduct that occurred over an extended period of time.

court deemed the mother's motion unopposed, and R.R. lost custody of his daughter. R.R. testified that he was heartbroken and incurred thousands of dollars in additional legal fees in attempting to vacate the custody order. Haddy's misconduct in M.B.'s case, likewise, constitutes serious harm. There, Haddy similarly failed to appear with M.B. in court—which M.B. testified left him feeling frustrated, scared, and nervous. Additionally, Haddy deprived M.B. of his funds for over two years.

Haddy argues that the harm to his clients was short-term. He contends that this factor weighs against disbarment because his misconduct caused short-term or temporary harm to his clients, and in some cases did not result in harm at all. Haddy's argument is unavailing. The duration of harm is merely a factor that we consider in assessing the extent and quality of harm to an attorney's clients. *See*, *e.g.*, *In re Quinn*, 946 N.W.2d 583, 592 (Minn. 2020) (concluding that attorney's 19-month failure to communicate important case-related information to client was minimally harmful because client obtained the information through other means); *Coleman*, 793 N.W.2d at 308 (Minn. 2011) (concluding client was harmed by attorney's failure to communicate results of an omnibus hearing for six weeks). Given the seriousness and scope of Haddy's misconduct, we place less weight on the duration of harm to each client. Moreover, Haddy minimizes the duration of harm that his clients experienced. As noted, M.B. did not have use of the funds he paid Haddy for over two years. Following Haddy's misconduct in R.R.'s case, R.R. was required to obtain a new lawyer and make efforts to undo the district court's custody order.

We conclude that the harm to Haddy's clients was significant. This weighs in favor of serious discipline.

4.

Finally, we consider the harm to the legal profession. Misappropriation, "by its very nature, harms not only the specific client, but also the public at large, the legal profession, and the administration of justice." *In re Ruttger*, 566 N.W.2d 327, 331 (Minn. 1997). Furthermore, a lawyer's neglect and failure to communicate with clients reflects negatively on the bar and impedes public confidence in the legal profession, which in turn "harms the public, the profession, and the justice system." *In re Nathanson*, 812 N.W.2d 70, 79 (Minn. 2012). Finally, an attorney's failure to cooperate with the Director's investigation "weakens the public's perception of the legal profession's ability to self-regulate," thereby "undermining the integrity of the attorney disciplinary system." *In re Brost*, 850 N.W.2d 699, 705 (Minn. 2010).

We therefore conclude that Haddy's misconduct—misappropriation, a pattern of client neglect, and failure to cooperate with the Director's investigation—seriously harmed the legal profession.

B.

In determining the appropriate discipline for attorney misconduct, we also consider whether any circumstances aggravate or mitigate an attorney's misconduct. *Nelson*, 733 N.W.2d at 463–64. Here, the referee found that Haddy's substantial legal experience, prior discipline, and lack of remorse are aggravating factors. The referee also found that Haddy failed to establish any mitigating circumstances. We begin by

addressing the aggravating factors. Then, we consider whether there were mitigating factors.

1.

Substantial experience practicing law is an aggravating factor because "it is assumed that an experienced attorney has had an opportunity to become familiar with the law." *In re Fett*, 790 N.W.2d 840, 851 (Minn. 2010). Haddy had been practicing law for 15 years when he committed the misconduct. The referee found that Haddy's substantial experience was an aggravating factor. Before this court, Haddy does not challenge the referee's conclusion that his substantial experience was an aggravating factor.

2.

An attorney's prior misconduct may be an aggravating factor. *In re Blomquist*, 958 N.W.2d 904, 915 (Minn. 2021). When an attorney has been sanctioned previously, we "expect a renewed commitment to comprehensive ethical and professional behavior after a disciplinary proceeding." *Nelson*, 733 N.W.2d at 464 (Minn. 2007). Haddy was previously admonished for misconduct in 2019. That admonishment concerned Haddy's failure to return client property, even after a court issued two orders instructing him to do so. The referee found that the prior misconduct was an aggravating factor. Haddy does not challenge the referee's conclusion that his prior misconduct was an aggravating factor.

3.

"Whether an attorney is remorseful … is an important issue in an attorney discipline case[.]" *Albrecht*, 779 N.W.2d at 538. Remorse "can be a mitigating factor in

27

considering the appropriate discipline," but a "lack of remorse can aggravate an attorney's misconduct." *In re Severson*, 860 N.W.2d 658, 670 (Minn. 2015). We have said that "[t]o express remorse, an attorney must express genuine regret and moral anguish for his or her conduct and the effect it had on others." *Id.*; *In re Kalla*, 811 N.W.2d 576, 583 (Minn. 2012) (concluding that attorney's "attempt to deflect blame highlights [his] lack of remorse and insight into his own conduct"); *see In re Aitken*, 787 N.W.2d 152, 163 (Minn. 2010) (concluding attorney did not show remorse by expressing remorse "for the consequences of his misconduct, but not remorse for his actual misconduct"). We have defined remorse in the attorney discipline context as the expression of "genuine regret and moral anguish" for the conduct and the effect the conduct had on others. *Severson*, 860 N.W.2d at 670.

> The referee found that Haddy lacked remorse. According to the referee,
>
> [Haddy] offered no testimony showing any, much less genuine, regret or anguish for his misconduct or for the extensive harm his misconduct caused. [Haddy] offered no apologies. [Haddy] made no mention of, much less expressed regret for, the financial and emotional harm his misconduct caused his clients to suffer. Referee finds that [Haddy] has not expressed regret or remorse for his actions.

The referee concluded that Haddy's lack of remorse was an aggravating factor.

Haddy argues that the referee erred by failing to recognize his remorse. He contends that he "continually acknowledged and understood his misconduct."

We review a referee's finding that a lawyer lacked remorse, and the determination that the lack of remorse constituted an aggravating factor, for clear error. *See Ulanowski*,

800 N.W.2d at 804. On this record, we discern no clear error in the referee's findings and conclusion.

At the evidentiary hearing, Haddy acknowledged much of the misconduct. He testified, for example, that he knew he should not have used M.M.'s funds, and that neglecting M.B.'s case was a "colossal mistake," and his "greatest disappointment." But Haddy did not express regret or moral anguish for his misconduct. He did not apologize to the individuals who testified—M.B., S.Z., and R.R. He minimized his misconduct, repeatedly noting that his former clients experienced no harm as a result of his misconduct. And, at times, he deflected blame for his misconduct. For example, Haddy testified that S.Z. was an angry person with substance abuse issues. We conclude that the referee did not clearly err in finding that Haddy lacked remorse and in relying on this finding as an aggravating factor.

4.

Although the referee found no mitigating factors, Haddy appears to argue before this court that two factors mitigated his misconduct: (1) he replenished M.M.'s funds before the Director initiated the disciplinary action and (2) he had no intention of permanently depriving M.M. or M.B. of their funds.

A lawyer's complete restitution of misappropriated funds may be a mitigating factor if the restitution was not motivated by the lawyer's "fear of getting caught." *Fairbairn*, 802 N.W.2d at 746. In *Fairbairn*, we held that a referee clearly erred by failing to consider complete restitution as a mitigating factor where the lawyer reimbursed transfers from a trust account in full before the Director commenced an

29

investigation. *Id.* Here, the referee found that Haddy replenished M.M.'s funds "prior to the discovery of the inappropriate withdrawals." Haddy argues that because he completely replenished the funds, and his restitution was not motivated by the Director's investigation, the referee clearly erred in failing to consider this as a mitigating factor.

We disagree that a lack of intent to permanently deprive M.M. and M.B. of their funds should mitigate Haddy's misconduct in those matters. A "lack of selfish motive or intent to permanently deprive clients of their funds" may mitigate an attorney's misappropriation of funds. *Klotz*, 909 N.W.2d at 339–40. As to the M.M. matter, though, we have already accounted for Haddy's lack of selfish motive or intent to permanently keep the funds by recognizing that Haddy's replenishment of the funds mitigated his misconduct.[20] Regarding Haddy's misappropriation in the M.B. matter, the referee was not persuaded that Haddy lacked selfish motive or intent to permanently deprive M.B. of the funds. The referee noted that Haddy "was obligated to refund any payment not earned," and that M.B.'s "multiple attempts to contact him undermines his claim that he just lost track of the case." Given this finding, which the record supports, we reject Haddy's argument that his misappropriation in the M.B. matter is mitigated by his lack of selfish motive or intent to permanently keep the funds.

---

[20] The referee "accept[ed] Mr. Haddy's claim that he did not intend to permanently deprive [M.M.] of the funds and that he had the ability to make the fund whole if necessary. His testimony in this regard is bolstered by his replenishing the trust fund before the violation was known by anyone."

C.

Finally, although we impose discipline "on a case-by-case basis," we are guided by "similar cases to ensure consistent discipline." *Kennedy*, 864 N.W.2d at 349. We now turn to our case law for guidance.

As noted, misappropriation "is particularly serious misconduct and usually warrants disbarment absent clear and convincing evidence of substantial mitigating factors." *Hulstrand*, 910 N.W.2d at 442. Likewise, a pattern of client neglect is serious misconduct, which alone may warrant indefinite suspension or even disbarment. *Lennington*, 969 N.W.2d at 83.

Our case law reveals that we have often disbarred attorneys for "the constellation of misappropriation of client funds, a pattern of client neglect and abandonment across multiple client matters, and prior discipline." *Id.* at 85. In *Lennington*, for example, we held that disbarment was appropriate where the attorney engaged in misconduct in six client matters, including misappropriation of a total of $10,750 in client funds by failing to perform work and failing to refund the funds, by engaging in a pattern of client neglect, by failing to comply with court orders, and ignoring the Director's communications. *Id.* at 83–85. The attorney in *Lennington* had previously been suspended for similar misconduct. *Id.*

On the other hand, in *Klotz*, we imposed an indefinite suspension where a similar constellation of misconduct existed, but the attorney did not have a previous disciplinary violation. In *Klotz*, the attorney misappropriated client funds, attempted to conceal the

31

misappropriation, and neglected clients. 909 N.W.2d at 333–34. Notably, however, there were several mitigating factors. *Id*. at 340.

With these precedents in mind, we conclude that the appropriate discipline for Haddy's misconduct is disbarment. Following a 2019 private admonition for failing to promptly return client property and knowingly and willfully disobeying two court orders to return the property, Haddy engaged in a constellation of misconduct for a two-year period that included misappropriation of client funds and a pattern of client neglect. Haddy's substantial experience practicing law and lack of remorse further aggravated his misconduct. Although we conclude that Haddy's replenishment of M.M.'s misappropriated funds mitigates the seriousness of the misconduct in that matter, this mitigating factor is not a *substantial* mitigating factor that impacts our decision regarding the appropriate discipline. Accordingly, we conclude that the appropriate discipline for Haddy is disbarment.

## CONCLUSION

For the foregoing reasons, respondent Bradley J. Haddy is disbarred from the practice of law in the State of Minnesota, effective on the date of this opinion. Haddy must comply with Rule 26, RLPR (requiring notice to clients, opposing counsel, and tribunals), and must pay $900 in costs under Rule 24(a), RLPR. Finally, to the extent his law firm's website is still active, respondent must take that website down completely within seven days of the date of this opinion.

Disbarred.

C O N C U R R E N C E

THISSEN, Justice (concurring).

I write separately because I do not agree the record supports two of the court's conclusions. First, I disagree that respondent Bradley J. Haddy violated Minnesota Rule of Professional Conduct 1.16(d) when he did not return M.B.'s advance payment of fees until after the Director initiated an investigation into M.B.'s complaint. The referee's findings do not establish that *Rule 1.16(d)* required Haddy to return the funds.

Second, on this record, I disagree that there is evidence to support a determination that Haddy *intentionally* misappropriated M.B.'s funds. The Minnesota Rules of Professional Conduct nowhere use the phrase "intentional misappropriation." Rather, it emerged as a label for a specific form of misconduct under Minnesota Rule of Professional Conduct 8.4(c). To establish a violation of Rule 8.4(c), the Director must prove with clear and convincing evidence that a lawyer's conduct relating to client funds "involv[ed] dishonesty, fraud, deceit, or misrepresentation." Minn. R. Prof. Conduct 8.4(c); *In re Charges of Unprofessional Conduct in Panel File 43372*, 984 N.W.2d 542, 547 (Minn. 2022) (stating that "[a]t a disciplinary hearing, the Director bears the burden of proving by clear and convincing evidence that [a lawyer] violated the Rules of Professional Conduct"). I conclude that the record does not show that the Director met that burden. Neither the referee's recommendation nor the record more broadly supports an "implicit" determination that Haddy's decision to deposit funds in his operating account rather than his trust account "involv[ed] dishonesty, fraud, deceit, or

misrepresentation," that Haddy refused to return funds to M.B. in an effort to deceive or defraud M.B., or that Haddy lied or made misrepresentations to avoid doing so.

Nonetheless, based on all the other misconduct Haddy committed, including intentional misappropriation of M.M.'s funds, I agree with the court that disbarment is the appropriate discipline.

A.

I begin with the referee's findings and the record. The referee's findings reflect that on or about December 27, 2022, after being charged with domestic assault, M.B. hired Haddy to represent him. M.B. gave Haddy $1,750 as attorney fees. M.B. and Haddy never entered into a written representation agreement. Haddy deposited the funds into his operating account instead of his trust account.

Haddy failed to file a certificate of representation with the district court as required by Minnesota General Rule of Practice 703. Haddy did not appear for a January 11, 2023, hearing in M.B.'s case. The district court reset the hearing for March 30, 2023. After the January 11 hearing, M.B. spoke with Haddy's assistant, who informed M.B. that Haddy had been out of town at another hearing. M.B. told Haddy's assistant about the rescheduled hearing on March 30 and made other efforts to contact Haddy before the hearing. Haddy did not appear at the March 30 hearing and the district court appointed a public defender for M.B.[1]

---

[1] Haddy's conduct outlined in this paragraph violates Minn. R. Prof. Conduct 1.3 (requiring a lawyer to act with "reasonable diligence and promptness in representing a client"), 1.4(a)(4) (requiring a lawyer to "promptly comply with reasonable requests for information"), 3.2 (requiring that a lawyer "make reasonable efforts to expedite litigation

Because Haddy had not filed a certificate of representation, the district court did not notify him that a public defender had been appointed. There is no evidence that M.B. attempted to contact Haddy between March 30 and August 2023, and the referee made no finding that M.B. informed Haddy that a public defender had been appointed. Haddy maintains that he "lost track" of M.B.'s case and the Director did not refute that testimony. In August 2023, another attorney sent a letter to Haddy on M.B.'s behalf seeking return of the $1,750 fee. The referee determined that the Director did not prove that Haddy received the letter. Neither M.B., the attorney, nor anyone else made any further effort to request that Haddy return the money. In short, the record does not reflect that Haddy learned that his representation of M.B. had terminated or that another lawyer had taken over representing M.B. until May 2024, when he was notified that M.B. had filed a disciplinary complaint against him.

M.B. filed the disciplinary complaint in spring of 2024, and the Director initiated an investigation. At that point, Haddy sought guidance from the Director about refunding M.B.'s fees. Haddy was concerned that if he returned the fees to M.B. it would appear he was trying to improperly influence M.B. in the disciplinary proceeding. The record suggests that the Director provided little guidance. In December 2024, Haddy sent two emails offering to return the $1,750 to the email address M.B. provide at their initial meeting. Haddy did not receive any notice that the emails were undeliverable or had not

---

consistent with the interests of the client"), and 8.4(d) (stating "[i]t is professional misconduct for a lawyer to … engage in conduct that is prejudicial to the administration of justice"). I agree with the court that he should be appropriately disciplined for this conduct.

been sent. M.B. testified he did not receive either email, that the email address was not his, and that he likely made up the email address because he lacked access to a computer.

At the hearing before the referee, Haddy maintained that he was willing to refund M.B.'s fees. At the time of the hearing, he had not yet done so.

B.

I turn next to the background on several forms of financial misconduct covered by the Minnesota Rules of Professional Conduct and our case law. For example, and as relevant here, funds a client pays a lawyer in advance, before the lawyer provides any legal services, generally remain the property of the client until the legal services are performed. *See* Minn. R. Prof. Conduct 1.5(b).[2] Under Rule 1.15(a)–(b), the rule on "safekeeping" client property, a lawyer must keep funds that belong to a client in a trust account until the lawyer earns the funds. In addition, when a client requests that a lawyer who is holding the client's funds return those funds, the lawyer must do so promptly. Minn. R. Prof. Conduct 1.15(c)(4).[3]

There are nuances to these general rules. For instance, under Rule 1.5(b)(1), a lawyer and a client may agree that the client will pay "a flat fee for specified legal services, which constitutes complete payment for those services and may be paid in …

---

[2]    Rule 1.5(b) states, in relevant part: "Except as provided below, fee payments received by a lawyer before legal services have been rendered are presumed to be unearned and shall be held in a trust account pursuant to Rule 1.15."

[3]    Rule 1.15(c)(4) states that "[a] lawyer shall … promptly pay or deliver to the client … funds … in the possession of the lawyer which the client … is entitled to receive."

advance of the lawyer providing the services." Minn. R. Prof. Conduct 1.5(b)(1). If the flat-fee agreement is reasonable, in writing, signed by the client before making payment, and includes specific provisions set forth in Rule 1.5(b)(1), "[the] flat fee shall be considered to be the lawyer's property upon payment of the fee." *Id.* Because the flat fee becomes the lawyer's property in this situation, the lawyer is not required to deposit the funds into a trust account.[4]

That does not end the analysis. Rule 1.5(b)(3) requires a lawyer to refund the unearned portion of a flat fee—even if the fee is the lawyer's property—if the lawyer-client relationship terminates before the fee is fully earned. Minn. R. Prof. Conduct 1.5(b)(3).[5] In addition, under Rule 1.16, the rule governing representation termination, a lawyer must, upon termination, "take steps to the extent reasonably practicable to protect a client's interests," including "refunding any advance payment of fees or expenses that has not been earned or incurred." Minn. R. Prof. Conduct 1.16(d).

---

[4] Further, Rule 1.5(b)(2) allows for "a fee to ensure the lawyer's availability to the client during a specified period or on a specified matter in addition to and apart from any compensation for legal services performed." Such an "availability fee may be considered to be the lawyer's property upon payment of the fee, subject to refund in whole or in part should the lawyer not be available as promised." *Id.*

[5] The Director does not allege that Haddy violated Rule 1.5(b)(3), and that rule is not at issue here. The Director's decision was appropriate because 1.5(b)(3) only applies to advance fees which are the property of the lawyer under Rule 1.5(b)(1) or (2). In this case, because Haddy and M.B. did not enter into a flat-fee written agreement as Rule 1.5(b)(1) requires, the fee advanced never became Haddy's property.

Importantly, for each of these provisions, failure to follow the rule's requirements constitutes a violation of the rule. No additional proof of a specific mental state—and notably no additional proof of intent to deceive, defraud, or misrepresent—is required.

Our case law also recognizes *intentional* "misappropriation" of client funds as conduct that violates the Minnesota Rules of Professional Conduct.[6] The Minnesota Rules of Professional Conduct do not mention the concept of "intentional misappropriation." Instead, it is a particular category of conduct that falls under Rule 8.4(c); a rule which provides that "[i]t is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." In other words, intentional misappropriation requires the Director to prove more than that a lawyer placed funds in the wrong account or failed to return funds that belonged to a client. Rather, the Director must prove by clear and convincing evidence that the lawyer took the client's money with "an intent to deceive"—the lawyer engaged in fraud or deceit, or lied or made misrepresentations to the client, in the course of the relevant conduct. *In re Varriano*, 755 N.W.2d 282, 288–90 (Minn. 2008). This additional level of proof is important because "intentional misappropriation"—misappropriation involving an intent to deceive or defraud or perpetrated through lies or misrepresentation—is a more serious form of misconduct than strict liability or negligent violations of the

---

[6]    The misappropriation label was first applied to describe lawyers' conduct in stealing money from their clients. *See, e.g.*, *In re Olsen*, 487 N.W.2d 871, 873 (Minn. 1992) (finding a violation of Rule 8.4(c) where a lawyer stole over $200,000 in client funds); *In re Wareham*, 413 N.W.2d 820 (Minn. 1987) (finding a violation of Rule 8.4(c) where a lawyer fraudulently misappropriated money from a client's estate). Such conduct is plainly fraudulent, deceitful, and dishonest and falls squarely within Rule 8.4(c).

Minnesota Rules of Professional Conduct and merits more serious discipline. *See, e.g., In re Tigue*, 843 N.W.2d 583, 587–89 (Minn. 2014) (imposing a lesser sanction of suspension of at least 30 days for unintentional misappropriation of client's funds and trust account violations).[7]

## C.

I now return to the specifics of this case and consider the court's conclusions regarding each of the referee's findings related to Haddy's financial misconduct in the M.B. matter.

## 1.

In this case, the referee determined that Haddy violated Rules 1.15(a) and 1.15(c)(5) (in addition to Rule 8.4(c) which I address in Part C.4 of this concurrence) when he placed M.B.'s advance payment into his operating account rather than a trust account. The court correctly affirms that determination. Such misconduct standing alone, however, does not merit disbarment. *See In re Schulte*, 869 N.W.2d 674, 677–80 (Minn. 2015) (suspending a lawyer for a minimum of four months for using trust account funds to pay for operating expenses but doing so without intent to deceive his clients).

---

[7] Because of Haddy's other misconduct, including "intentional misappropriation" of M.M.'s funds in violation of Rule 8.4(c), all members of the court agree that disbarment is the appropriate discipline in this case. But in another case where the allegations are limited to conduct similar to Haddy's conduct in representing M.B., our analysis of whether the conduct is intentional misappropriation in violation of Rule 8.4(c) could lead to imposing significantly different discipline.

2.

The referee determined that Haddy *did not* violate Rule 1.15(c)(4), the rule requiring a lawyer to return client funds *upon request*, concluding that the Director failed to prove by clear and convincing evidence that Haddy actually received a request from M.B. or his representative to return the advance fee M.B. paid. According to the referee:

> On August 16, 2023, [another attorney] sent a letter to [Haddy] on behalf of [M.B.] seeking a return of the $1,750 fee. [Haddy] testified he never received the letter. There is no definitive evidence as to whether the letter was, in fact, received. There were no further follow-up attempts by [the other attorney] or anyone else for the return of the money. [Haddy] testified he would have returned the money if he had received a request to do so.

The referee found no evidence that Haddy received the August 2023 letter requesting a refund. Thus, there is no evidence that Haddy knew that his representation of M.B. had ended. The referee determined that nothing in Rule 1.15(c)(4) required Haddy to refund the $1,750 M.B. paid—a common sense result.

3.

I turn to the court's determination that the referee's finding that Haddy violated Rule 1.16(d) was not clearly erroneous. In a single sentence, the referee found that "the Director has proven by clear and convincing evidence that [Haddy's] failure to refund 'any advance payment' violated Rule 1.16(d)." The referee did not analyze, and made no determination as to, when Haddy learned he was terminated or whether refunding the $1,750 was "reasonably practicable" as Rule 1.16(d) requires. That lack fundamentally undermines the referee's determination that Haddy violated Rule 1.16(d).

Rule 1.16(d), by its terms, does not apply until a lawyer's representation of a client terminates. The record does not establish that M.B. ever expressly discharged Haddy. *See* Minn. R. Prof. Conduct 1.16(a)(3). The referee found that the Director failed to prove Haddy received the August 2023 letter seeking a refund, and M.B. testified he made no further attempts to communicate with Haddy after the district court appointed a public defender to represent M.B. Further, because of Haddy's own failure to file a certificate of representation, the district court never informed Haddy that it had appointed a public defender to represent M.B. The referee made no finding on when termination occurred. Because Rule 1.16(d) only applies following termination, the court's reliance on Haddy's conduct in failing to respond to M.B.'s communications before the second hearing on March 30—at which the public defender was appointed—is misplaced.

Further, a lawyer does not violate Rule 1.16(d) by failing to refund an advance payment of fees that have not been earned unless it is reasonably practicable to do so. Minn. R. Prof. Conduct 1.16(d). The record reflects that Haddy attempted to return the advance fees to M.B. Haddy sent two emails to M.B. at the email address M.B. had provided inquiring about where to send the refund. The emails were not returned as undelivered. M.B. testified he probably made up the email address, so M.B. never received Haddy's messages and Haddy had no information about where to send a refund. There is nothing in the record indicating that M.B. ever provided Haddy with a phone number. On this record, I cannot agree with the referee that the Director proved by clear and convincing evidence that it was "reasonably practicable" for Haddy to refund M.B.'s

$1,750 advance payment. I therefore disagree with the court's decision to affirm the referee's finding that Haddy's conduct violated Rule 1.16(d).

4.

I next address the court's determination that the referee did not err in finding Haddy engaged in dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c). In his initial order, the referee determined that "[i]n the [M.B.] matter, Director has proven by clear and convincing evidence that [Haddy] by accepting a retainer fee without a written agreement of representation and failing to deposit the funds into his trust account violated Rules 1.15(a) and 8.4(c)." A week later, the referee issued an amended order, revising the finding quoted above as follows:

> In the [M.B.] matter, Director has proven by clear and convincing evidence that [Haddy] by accepting a retainer fee without a written agreement of representation and failing to deposit the funds in his trust account violated Rule[] 1.15(a), and *[Haddy's] use of the funds for business and/or personal [sic] constitutes misappropriation of funds* in violation of Rules 1.15(a) and 8.4(c), MRPC.

(Emphasis added.) The referee made no additional findings supporting that change.

The referee's determination that Haddy's conduct with regard to M.B.'s fees violated Rule 8.4(c) is unsupported because a violation of that rule requires dishonesty, fraud, deceit, or misrepresentation. Nothing in the record suggests that Haddy's decision to deposit M.B.'s funds in his operating account involved dishonesty, fraud, deceit, or misrepresentation. The referee did not make a finding to that effect. Indeed, the referee's relevant finding is that Haddy deposited the money in his operating account because Haddy understood M.B.'s payment to be a flat fee for specific legal services. The referee

C-10

further found that *M.B.* "was uncertain if the fee was a flat fee or a retainer for services to be rendered. [Haddy] testified that he only represented clients under a flat fee arrangement."

These findings are informative. Had Haddy and M.B. entered into a written agreement providing that the $1,750 was a "flat fee for specified legal services, which constitutes complete payment for those services and may be paid … in advance," the $1,750 would have been Haddy's property upon receipt. Minn. R. Prof. Conduct 1.5(b)(1). Under such circumstances, Haddy's decision to deposit the funds in his operating account would have been proper. The referee expressly found that Haddy himself understood the $1,750 payment to be a flat fee and there is no evidence in the record refuting that understanding. While Haddy's understanding was undoubtedly incorrect under Rules 1.5(b)(1) and 1.15, his error and misconduct were in failing to put in writing his agreement with M.B. that M.B.'s advance payment was a flat fee, as Rule 1.5(b)(1) requires.

Among other things, we are disciplining Haddy for his misconduct in depositing M.B.'s funds into the wrong account. But in assessing whether Haddy's conduct in retaining the funds was *intentional* misappropriation—whether it involved dishonesty, fraud, deceit, or misrepresentation—the fact that Haddy did not understand or overlooked his obligation to deposit M.B.'s payment into a trust account is dispositive.

Here, the referee made no express finding that Haddy's decision to deposit M.B.'s funds in his operating account, with the understanding that the funds were his property, was an act "involving dishonesty, fraud, deceit, or misrepresentation." Minn. R. Prof.

C-11

Conduct 8.4(c). And the referee's own factual determinations about Haddy's understanding based on the record evidence undermine any implicit finding to that effect. The referee's determination that Haddy incorrectly understood that M.B.'s advance funds were his property also means that Haddy using those funds for business (to the extent there is evidence to support that) was not an act of misappropriation involving dishonesty, fraud, deceit, or misrepresentation—at least up to the time that Haddy learned that M.B. had terminated his representation. And there is *no evidence* that Haddy converted the funds for *personal use* (which may explain the referee's formulation that Haddy put the funds to "business and/or personal" use). The record does not support the referee's finding that Haddy converted M.B.'s funds to personal use and that finding is clearly erroneous.

That does not end the analysis. The record shows that Haddy ultimately found out that his representation of M.B. had been terminated when he learned that M.B. had filed a complaint with the Office of Lawyers Professional Responsibility. At that point, Haddy had an obligation under Rule 1.16(d) to return the funds because he had performed no work for M.B. As discussed above, he attempted to do so. He sent two emails to M.B. at the email address M.B. had provided asking where to send the refund and got no reply. Haddy ultimately did return M.B.'s funds.[8] Once again, the record does not clearly and

---

[8]    The court emphasizes that Haddy did not return M.B.'s funds while discipline proceedings were pending. The record shows that Haddy asked the Director whether returning the funds while the investigation and proceedings were underway would itself constitute additional misconduct of trying to improperly influence M.B. The Director did not provide a direct answer.

convincingly support an implicit determination that Haddy's failure to return the funds was conduct involving dishonesty, fraud, deceit, or misrepresentation.

The court upholds the referee's determination based on dicta in *In re Taplin* that misappropriation (in some form) "may occur when a lawyer 'perform[s] no work on [client] matters and never return[s] the funds to the clients.' " 837 N.W.2d 306, 311 (Minn. 2013) (quoting *In re Lundeen*, 811 N.W.2d 602, 608 (Minn. 2012)). In *Taplin*, we did not even apply this statement—we found no intentional misappropriation because the lawyer "performed at least *some* work" for both client matters at issue. *Id.* at 311. In *In re Voss*, we concluded a lawyer misappropriated funds because the lawyer (1) agreed to a fee lower than the amount of the client's advance payment and refused to refund the balance, (2) performed no work, and (3) refused to return the client's funds when the representation ended. 830 N.W.2d 867, 874 (Minn. 2013). In *In re Lundeen*—the case on which we relied in *Voss*—a lawyer also refused to return unearned fees to her clients and lied to clients to avoid returning the funds. 811 N.W.2d at 605, 606, 607, 608. The lawyer's deliberate refusal to return unearned funds under circumstances where the lawyer knew the funds should be returned, combined with lies and misrepresentation, transformed her conduct into dishonesty, fraud, and deceit under Rule 8.4(c). *See id.* at 608. Here, in contrast, there is no evidence that Haddy ever lied or made misrepresentations to M.B., or that he refused to return M.B.'s funds once he knew he needed to do so. The referee's findings suggest that Haddy made reasonable efforts to return M.B.'s payment when he learned all the facts. Ultimately, the Director does not

dispute Haddy's position that he refunded M.B. following the evidentiary hearing in the disciplinary complaint.

For the reasons stated, I cannot agree with the court that the referee implicitly found that Haddy depositing M.B.'s funds into his operating account and his failure to return the funds after he learned the facts that obligated him to do so constitute conduct involving dishonesty, fraud, deceit, or misrepresentation, nor that the record clearly and convincingly supports such a finding. The referee's own findings are inconsistent with such a determination. There is no question that Haddy failed to represent M.B. at all, and his conduct warrants discipline. But the only thing the Director proved by clear and convincing evidence was that Haddy acted negligently in handling M.B. fees. For that reason, I cannot go along with the court's decision to uphold the referee's finding that Haddy violated Rule 8.4(c) by engaging in intentional misappropriation in his dealings with M.B.

5.

Finally, the court correctly states:

> Our case law has not always been clear about the distinction between "intentional" and "negligent" misappropriation of client funds. The referee did not make a finding as to whether Haddy's misappropriation of M.B.'s funds was intentional or negligent, and Haddy does not raise any argument to this court regarding this distinction.

*Supra* at 20 n.16.[9]

---

[9] Although the referee did not make explicit findings as to whether Haddy's misappropriation was intentional or negligent, the description of Haddy's conduct in the referee's revised finding—that Haddy failed to place funds into his trust account and used the funds in the operating account for business and/or personal uses—tracks the concept

"Negligent misappropriation occurs when an attorney places a client's funds into a trust account but later removes those funds from the trust account to pay an obligation incurred on behalf of another client because of the attorney's failure to maintain proper trust account books and records" and not because of a deceitful intent. *In re Klotz*, 909 N.W.2d 327, 337 (Minn. 2018). The concept of negligent misappropriation does not appear in the Minnesota Rules of Professional Conduct, but we have recognized it in our case law. *In re Lieber*, 939 N.W.2d 284, 294–95 (Minn. 2020); *see In re Majors*, 973 N.W.2d 621, 632 (Minn. 2022) (Thissen, J., dissenting). Negligent misappropriation, as is evident from its name, is not a violation of Rule 8.4(c) and does not require proof of conduct "involving dishonesty, fraud, deceit, or misrepresentation." *Lieber*, 939 N.W.2d at 294–95. Because both "intentional misappropriation" and "negligent misappropriation" are labels we have invented, as the court notes, we have sometimes been sloppy in failing to differentiate between the two.

Although the court states that it "need not and do[es] not decide whether [Haddy's] misappropriation was intentional, negligent, or accompanied by some other state of mind," it nonetheless proceeds to decide precisely that issue. The court is imposing discipline under Rule 8.4(c) in the M.B. matter because Haddy misappropriated M.B.'s funds by depositing them in Haddy's operating account and failing to return them.

of negligent misappropriation. The Director, however, did not claim that Haddy engaged in negligent misappropriation. And because Haddy did not put M.B.'s funds in his trust account, the specific concept of negligent misappropriation does not apply in this case. Notably, negligent misappropriation is not misconduct warranting disbarment. *In re Thao*, 929 N.W.2d 443 (Minn. 2019) (order); *Schulte*, 869 N.W.2d at 677–80.

To violate Rule 8.4(c), Haddy's conduct must have involved dishonesty, fraud, deceit, or misrepresentation. A finding that misrepresentation violated Rule 8.4(c) is, by definition, a finding that the misappropriation was intentional.

In my view, we should move away from the quagmire we have created by using the term "misappropriation" as loose shorthand to describe different money-related violations of the Rules of Professional Conduct. It is a thought-terminating label that obscures our reasoning and jurisprudence. Instead, since we have adopted written rules governing lawyer conduct, we should apply the actual rules that we have adopted as we would a statute or any other written law. A lawyer who takes a client's money through dishonesty, fraud, deceit, or misrepresentation violates Rule 8.4(c). A lawyer who mishandles a client's money in ways prohibited by specific Minnesota Rules of Professional Conduct (e.g., Rules 1.5, 1.15, 1.16, and Appendix 1) without dishonesty, fraud, deceit, or misrepresentation should be appropriately disciplined for violations of those rules established by clear and convincing evidence. And if there is some other form of misappropriation conduct harmful to clients that is not covered by the current Minnesota Rules of Professional Conduct, we should adopt a new rule prohibiting such conduct.

In this case, there is no reason for us to wade further into the misappropriation swamp. Even if we concluded that the Director did not produce clear and convincing evidence that Haddy's representation of M.B. violated Rules 1.16(d)(1) and 8.4(c), we would still disbar him for his rule violations in other matters.